**JUPITER WRECK, INC., Plaintiff,**

v.

**The UNIDENTIFIED, WRECKED AND ABANDONED SAILING VESSEL, her tackle, armament, apparel, and cargo located within 1,000 yards of a point located at coordinates 26° 56.4′ North Latitude, 80° 04.15′ West Longitude, Defendant.**

**STATE OF FLORIDA; Board of Trustees of the Internal Improvement Trust Fund; the Department of Natural Resources; Department of Environmental Regulation; and The Division of Historic Resources, Florida Department of State, Plaintiffs,**

v.

**JUPITER WRECK, INC., Defendant.**

**Nos. 87–8548–CIV, 87–8619–CIV.**

United States District Court, S.D. Florida.

July 15, 1988.

David Paul Horan, Key West, Fla., for Jupiter Wreck, Inc.

Eric J. Taylor, Asst. Atty. Gen., State of Fla., Tallahassee, Fla., for the State, et al.

ORDER GRANTING IN PART AND DE-NYING IN PART PRELIMINARY INJUNCTIVE RELIEF IN CASE NO. 87-8548-CIV-MARCUS; FINAL OR-DER GRANTING MOTION FOR RE-MAND IN CASE NO. 87-8619-CIV-MARCUS

MARCUS, District Judge.

THIS CAUSE is before the Court on Jupiter Wreck, Inc.'s ("JWI") Motion for Entry of Preliminary Injunction filed in case 87-8548-CIV-MARCUS (the *"in rem* action"), and the Plaintiffs' Motion to Remand filed in case 87-8619-CIV-MARCUS (the "removed action"). These cases center on the remains of a Spanish Galleon which sunk off the coast of Florida sometime in the late seventeenth century. The "vessel" now lies beneath the shallow water in the Jupiter Inlet, about 100 yards from the beach. JWI seeks to uncover the artifacts from this site for their historical and monetary value. The State of Florida, and various departments of the State, have sought to prevent the excavation of the remains of the vessel by JWI because, as the holder of title to the land where the vessel is located, it has enacted licensing procedures with which JWI must comply in order to conduct the intended salvage activity. Moreover, the State legislature has enacted statutes which vest title of the artifacts in State agencies.

The status of historical shipwrecks located on State territory has generated significant controversy over the years. Courts presented with questions similar to those before us have produced divergent results based on conflicting rationale. Recognizing the "confusion over the ownership and authority to manage abandoned historic shipwrecks" in State waters, H.R.Rep. No. 100-514(I), 100th Cong., 2d Sess. 2, *reprinted in* 1988 U.S.Code Cong. & Ad. News 365, 366, Congress has recently enacted the Abandoned Shipwreck Act of 1987, Pub.L. No. 100-298, 102 Stat. 432 (1988), which vests title to certain abandoned shipwrecks located on state lands in the respective States. Section 7(c) of this Act specifically states that it shall "not affect any legal proceeding brought prior to the date of enactment...." Since the *in rem* action was filed before that law was enacted it has no application to this suit.[1]

We believe that the two cases before this Court starkly present fundamental issues of federalism framed by the direct collision between federal admiralty jurisdiction and the immunity from suit afforded the State of Florida by the Eleventh Amendment, between federal salvage law and the State's police power, and finally between the power of federal courts and state courts.[2] Since we conclude that the Elev-

---

1. On May 23, 1988 JWI filed a *Motion To Allow Salvage To Proceed.* Therein the salvor claimed that the federal assertion of title under section 6(a) of the Abandoned Shipwreck Act of 1987, and the transfer of title to the state under section 6(c) of that Act, makes clear that prior to the enactment of this law title to the res was not held by the State. JWI contends that if the State held title there would have been no need to enact this legislation, and that this Court is compelled to construe this Act so that it has some meaningful effect.

We decline to adopt such a view. First, this case does not require us to interpret this law. Second, assuming *arguendo* that this legislation is instructive as to the ownership of the res, we find that it is not dispositive here. The purpose of this Act was to eliminate the confusion over ownership of historic shipwrecks in State waters. To that end, we view the legislation as supplanting existing law on the subject. Section 7(a) states explicitly that "[t]he law of salvage and the law of finds shall not apply to abandoned shipwrecks to which section 6 of this Act applies." Accordingly, to the extent that this Act may be informative as to the state of the law which operates as to this case, it underscores our conviction that we must apply the law of finds and the law of salvage to these facts. We reject the notion that it dispositively establishes that the State of Florida does not have a colorable claim to title of the res here.

2. The particular facts of this case highlight these conflicts. While the State maintains that theoretically the licensing procedures afford salvors the opportunity to ply their trade after obtaining the requisite permits, here any attempts by JWI to gain the state's permission will be futile. The State has represented that under the circum-

enth Amendment bars the resolution of the issue of title to the res, a preliminary injunction may not issue in the *in rem* action. Further, since the Complaint in the removed action is based solely on state law, that cause must be remanded to state court. JWI's prayer for a salvage award need not be resolved on the motion for preliminary injunction and remains an open issue in this action.

## I. PROCEDURAL HISTORY

1. On July 27, 1987 a complaint *in rem* was filed by JWI[3] against the Unidentified, Wrecked and Abandoned Vessel, her tackle, armament, apparel and cargo located within 1,000 yards of a point located at coordinates 26° 56.4′ North Latitude, 80° 04.15′ West Longitude (the "vessel"). The Court assumed jurisdiction pursuant to 28 U.S.C. § 1333. A warrant of arrest was issued that day and JWI was appointed substitute custodian. In the Complaint, JWI sought the following: to be declared salvor of the vessel; to be put in possession of the vessel; that title and/or full possession be confirmed against all claimants and all the world; a full and liberal salvage award; and finally attorney's fees and costs.

2. On August 11, 1987 an enforcement action was brought by the State of Florida, the Board of Trustees of the Internal Improvement Trust Fund ("Board of Trustees"), the Department of Natural Resources ("DNR"), Department of Environmental Regulation ("DER"), and the Division of Historic Resources, Florida Department of State ("DHR") (collectively the "State") against JWI in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida. In a four count complaint the State sought to enjoin JWI from trespassing, damaging, or using State sovereignty submerged lands without first obtaining the required consent of the Board of Trustees, DER and DHR; civil penalties of $10,000 per day for each day of each violation of Chapters 253 and 403 of the Florida Statutes; an order requiring JWI to turn over to DHR all artifacts' recovered from state-owned submerged lands; and money damages for damage to state-owned submerged lands and historic artifacts. An Order was entered that same day by the Circuit Court granting the injunctive relief sought by the State.

3. On August 21, 1987 JWI moved, in the *in rem* action, for a preliminary injunction seeking an order enjoining the officers, agents and employees of the State of Florida as well as all other persons, firms and corporation from interfering with JWI in its right to salvage.

4. JWI removed the state court action to federal court on August 24, 1987 and thereafter the two actions were consolidated before this Division. [Order of Transfer, September 22, 1987].

5. On August 26, 1987 the State moved to remand the removed action to state court and also moved for an Order preliminarily enjoining JWI from working the wrecksite until the motion to remand had been resolved or until the proper permits had been issued.

6. Eric J. Taylor, Assistant Attorney General for the State of Florida filed a notice of appearance in the *in rem* case on behalf of the State and its departments "for the sole purpose of answering the Plaintiff's Motion for Preliminary Injunction. These parties do not appear in this Court for any other purpose in this case." [Notice of Limited Appearance, August 28, 1987].

7. An evidentiary hearing was held before this Court on September 14 and 16, 1987. The matters have been fully briefed

stances of this case, JWI cannot get a permit to salve this wreck even if a permit application was made. [*See* Transcript of Hearing Before the Honorable Stanley Marcus, September 14, 1987 at 33–35].

**3.** The *in rem* action was originally filed by Dominic Addario, Jr. Also, Dominic Addario, Jr. was the original Defendant in the removed action. On September 14, 1987 this Court entered an Order substituting Jupiter Wreck, Inc. for Dominic Addario, Jr. as a party in both actions. For purposes of clarity we shall refer to Jupiter Wreck, Inc. as though it has appeared as a party throughout these proceedings.

and argued, and we make the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

1. JWI is a Florida Corporation and the Plaintiff and Substitute Custodian in the *in rem* action, and the Defendant in the removed action.

2. An unidentified, wrecked and abandoned vessel, her tackle, armament, apparrel and cargo located within 1,000 yards of a point located at coordinate 26° 56.4′ North Latitude, 80° 04.15′ West Longitude was arrested by Order of this Court dated July 27, 1987.

3. The wreck is believed to be that of a Spanish galleon that sank in the late seventeenth century. It is located approximately *100 yards offshore* under approximately 10 to 20 feet of water in the Jupiter Inlet, Jupiter Beach, Florida. The wreck exists in an active marine environment which means that "the materials are covered and uncovered by storm action, they are in a surf zone where the water is reoxygenated continuously." [Transcript of Hearing before the Honorable Stanley Marcus, September 14, 1987 at 52.]

5. The vessel was located by JWI on or about July 13, 1987, and the salvage of artifacts began at that time. Various objects have been recovered including gold and silver coins, and other objects including one canon and two anchors. Other large artifacts remain embedded in the ground.

6. Some artifacts lie on the surface of the ground while others are buried under the sand at depths of six inches to several feet. [*Id.* at 62–63]. They are subject to deterioration but "not at a very fast rate." [*Id.* at 62].

7. The beach along the Jupiter Inlet is subject to constant erosion, and "at least once every two years ... a dredge outfit or the Army Corp of Engineers ... will dredge through inside of the inlet and pump the soil out onto Jupiter Beach. So, Jupiter Beach basically is constantly eroded and filled in by dredge." [*Id.*, September 16, 1987 at 28].

8. On July 29, 1987 Florida Marine Patrol Officers instructed divers associated with JWI that all diving was to cease and no one was to be allowed near the wrecksite. After being informed that the salvage activity was being performed under the jurisdiction of this Court, the Patrol Officers stated that their earlier instructions could be disregarded. [Interim Status/Salvage Report August 6, 1987 at 3].

9. The parties entered into a Stipulation, approved by the Court, which allowed JWI to conduct remote sensing and mapping surveys of the wrecksite and that the salvage operation could be conducted without major digging or excavation of the wrecksite. "Hand-fanning" was allowed while site-mapping, and JWI was allowed to recover small objects that could be lost if left at the wrecksite.

10. The artifacts removed from the remains of the vessel are listed in an inventory filed with the Court on January 15, 1988.

11. The remains of the vessel claimed by JWI are objects of antiquity which are of archeological interest.

12. Jupiter has neither applied for nor received a permit from the State to remove the artifacts of the defendant vessel.

13. Carl J. Clausen, associate professor at the University of Miami and formerly Chief Archeologist for Florida and Texas, has worked with the salvors to develop an archeological research design in order to document the artifacts recovered from the wrecksite [Plaintiff's Exhibit 1]. Plaintiff has conducted the salvage with due regard for the historical importance of the site and the preservation of the artifacts.

14. The res is in "marine peril."

## III. CONCLUSIONS OF LAW

### A. *Preliminary Injunction*

1. JWI seeks a preliminary injunction "enjoining all persons, firms and corporations including governmental agencies of the State of Florida, their agents and attorneys from interfering with the Plaintiff in his right to continued salvage on the subject vessel." [Plaintiff's Motion for Preliminary Injunction at 4]. Four elements must

be present in order for a court to enter a preliminary injunction. There must exist: (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest. *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974) (citations omitted). The Plaintiff has the burden of persuasion as to each of these elements. The failure to sustain this burden with regard to any one of the prerequisites is fatal to the motion. *See United States v. Jefferson County*, 720 F.2d 1511, 1519 (11th Cir.1983); *Canal Authority*, 489 F.2d at 573.

■ Here, we conclude that a preliminary injunction may not issue because JWI cannot sustain its burden of demonstrating the existence of all four prerequisites. "[R]egardless of the balance of relative hardships threatened to the parties, the granting of a preliminary injunction would be inequitable if the the plaintiff has no chance of success on the merits." *Canal Authority*, 489 F.2d at 576. Based on Florida's immunity from suit under the Eleventh Amendment, the Plaintiff is without any possibility of success in gaining title or full possession of the res in this forum, without the consent to suit by the State.

2. The first, and in our view, critical hurdle faced by JWI, is the likelihood of success on the merits of its claim. The Complaint seeks title to and possession of the vessel as well as a liberal salvage award. Accordingly, in order for JWI to be entitled to a preliminary injunction, it must be able to demonstrate that there is a substantial likelihood that it is entitled to title or full possession of the vessel. The claim for a salvage award, if proper in this case, would not require the entry of a preliminary injunction because that relief is directed only toward the reward of efforts actually expended and compensated for the property recovered. Accordingly, with regard to the claim for a salvage award, unlike the possession claim, there is no need to maintain the "status quo" until a resolution on the merits.

3. While it is well-settled that a suit against a State in federal court is barred by the Eleventh Amendment absent its consent, the instant action does not clearly present such a circumstance. Facially, JWI is attempting to assert its rights as a salvor under federal maritime law. Therefore, an *in rem* action was brought against the subject property. The State is not named as a defendant, and no relief is sought directly against the State or its agents. Absent the State's restricted appearance in this matter, we would have no occasion to consider the Eleventh Amendment issue. Further, the appearance by the State is not for the purpose of obtaining any specific form of relief. Rather, it has appeared only to oppose the motion for injunctive relief by asserting its claim of title to the res. However, the State, unlike the Plaintiff, has not sought from the Court a decree awarding it title or possession of the vessel. Accordingly, the posture of this case does not require us to determine whether the State or JWI actually owns the vessel. Instead, we must only analyze JWI's likelihood of success in *its* claim of ownership or entitlement to full possession. Based on the Supreme Court decision in *Florida Department of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982) and its progeny, we conclude that the Plaintiff is without any likelihood of success in obtaining title or full possession to the res, in this Court, absent consent to suit by the State.

■ 4. The Eleventh Amendment has been interpreted consistently by the Supreme Court to mean "that an unconsenting State is immune from suit brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974) (citations omitted). In *Treasure Salvors, supra,* the Court found that an action by a salvor to secure property held by state officials with-

out a colorable claim to title was not barred by the Eleventh Amendment. However, the Court determined that the federal court "did not have power, ... to adjudicate the State's interest in the property without the State's consent." *Treasure Salvors,* 458 U.S. at 682, 102 S.Ct. at 3313; *see also id.* at 703 & n. *, 102 S.Ct. at 3323 & n. * (White, J. concurring in the judgment and dissenting in part) (eight Justices agree that court without power to determine State's ownership of artifacts). There, it was "undisputed that the property was not found on state land...." *Id.* at 696, 102 S.Ct. at 3320. In the present *in rem* case, the property was found on land owned by the state, *see infra,* and Florida has not consented to be sued in this forum.

The *Treasure Salvors* Court relied, in part, on the decision of *In re New York, No. 2,* 256 U.S. 503, 41 S.Ct. 592, 65 L.Ed. 1063 (1921). The plurality decision written by Justice Stevens interpreted that case as standing for the proposition that "an action —otherwise barred as an *in personam* action against the State—cannot be maintained through seizure of property owned by the State." *Treasure Salvors,* 458 U.S. at 699, 102 S.Ct. at 3322. Justice White read *In re New York, No. 2* as holding that "sovereign immunity bars process against a res in the hands of state officers." *Treasure Salvors,* 458 U.S. at 709, 102 S.Ct. at 3327; *see also Welch v. Texas Department of Highways and Public Transportation,* — U.S. —, 107 S.Ct. 2941, 2954–55 & n. 21, 97 L.Ed.2d 389 (1987). More recently, a plurality of the Court in *Welch,* stated that the Court in *In re New York, No. 2* "held that a private citizen may not bring an admiralty action *in rem* against a vessel owned by a State." *Welch,* 107 S.Ct. at 2954.

■ The *in rem* action here does not fit neatly within the constructs of these precedents. This action against the vessel is not an *in personam* action against the State disguised by the seizure of certain property. It is a legitimate salvage action commenced pursuant to established admiralty principles. Further, unlike *Treasure Salvors,* the res here is not in the hands of state officers. Moreover, this action was not brought against a vessel indisputably owned by Florida. We recognize only that Florida has asserted a colorable claim to title of the res and has not consented to suit in this forum. However, under *Treasure Salvors,* we cannot conclude that Florida does in fact own the res, and therefore the action itself is not barred; but we can only conclude that JWI cannot succeed on *its* claim to ownership or full possession because the ownership status of the State must remain unresolved.

In a case strikingly similar to the one at bar the First Circuit Court of Appeals affirmed a decision of the District Court to dismiss an *in rem* admiralty action where a wreck was discovered one quarter mile off the coast of Massachusetts, and the salvor sought title, possession and a salvage award. The Commonwealth of Massachusetts filed a restricted appearance solely for the purpose of asserting an Eleventh Amendment defense. Relying on *Treasure Salvors,* and recognizing that Massachusetts was the Plaintiff's "principal opponent," although not a named defendant, *see Ford Motor Co. v. Department of Treasury of Indiana,* 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945), the First Circuit held "that when a state, asserts title to antiquities lodged within the seabed under its authority, the Eleventh Amendment bars federal adjudication of the state's interest, absent its consent." *Maritime Underwater Surveys, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel,* 717 F.2d 6, 8 (1st Cir.1983); *see also Florida v. Treasure Salvors, Inc.,* 689 F.2d 1254, 1256 (5th Cir.1982) (Treasure Salvors III); *Subaqueous Exploration & Archeology, Ltd. v. Unidentified, Wrecked and Abandoned Vessel,* 577 F.Supp. 597 (D.Md. 1983); *cf., Platoro Ltd., Inc. v. Unidentified Remains of a Vessel,* 695 F.2d 893, 898–901 (5th Cir.) (waiver of Eleventh Amendment immunity), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983); *Riebe v. Unidentified, Wrecked and Abandoned 18th Century Shipwreck,* 691 F.Supp. 923, 926 (E.D.N.C.1987); *Chance v. Certain Artifacts Found and Salvaged*

*from the Nashville,* 606 F.Supp. 801, 803–04 (S.D.Ga.1984) (waiver of Eleventh Amendment immunity), *aff'd,* 775 F.2d 302 (11th Cir.1985).

5. In light of this authority, JWI has challenged the basis on which the State has asserted title to the property. JWI contends that the law relied upon by the State is pre-empted by federal maritime law. Specifically, Plaintiff relies on *Cobb Coin Co. v. Unidentified, Wrecked and Abandoned Sailing Vessel,* 525 F.Supp. 186 (S.D.Fla.1981) (*Cobb Coin I*), for the proposition that "Florida's licensing scheme and the criminal penalties imposed for noncompliance therewith conflict impermissibly with federal maritime principles...." *Id.* at 200.

■ JWI's invocation of the pre-emption doctrine must fail for two reasons. First, under controlling precedent in this Circuit, the resolution of a claim to ownership and full possession of an historic shipwreck must be based on the application of the common law of finds. Second, even assuming *arguendo* that the law of finds does not apply here, the state regulatory scheme would not be preempted by federal maritime principles.

6. As stated by the First Circuit, "there is a generic question as to when the law of finds ... applies to property retrieved from the ocean floor, and when the law of salvage pertains.... [T]he better-reasoned authorities agree that the law of finds may appropriately be utilized." *Martha's Vineyard Scuba Headquarters, Inc. v. Unidentified Wrecked and Abandoned Steam Vessel,* 833 F.2d 1059, 1065 (1st Cir.1987) (citations omitted). The former Fifth Circuit Court of Appeals has held that it is appropriate to apply the law of finds rather than the law of salvage for two general reasons. First, the court recognized that salvage law is premised on the notion that the owner of property abandoned at sea has not been divested of title. *Treasure Salvors, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel,* 569 F.2d 330, 336 (5th Cir.1978) (*Treasure Salvors I*); *see also Klein v. Unidentified, Wrecked and Abandoned Sailing Vessel,* 758 F.2d 1511, 1514 (11th Cir.1985); *Chance,* 606 F.Supp. at 804; *Subaquaeous Explorations,* 577 F.Supp. at 611; *Klein v. Unidentified, Wrecked and Abandoned Sailing Vessel,* 568 F.Supp. 1562, 1565 (S.D.Fla.1983), *aff'd,* 758 F.2d 1511 (11th Cir.1985). Yet, it found that "[d]isposition of a wrecked vessel whose very location has been lost for centuries as though its owner were still in existence stretches a fiction to absurd lengths." *Treasure Salvors I,* 569 F.2d at 337. Second, application of the laws of finds and salvage do not produce inconsistent results. If the owner of the vessel is actually in existence a salvage award is meant to fully compensate the salvor for his efforts, and "may include the entire derelict property." *Id.* at 337 (footnote omitted). But, if the property has actually been abandoned by the owner, then the law of finds rewards the first finder with title and possession.

■ Courts have applied the law of finds to cases concerning historic shipwrecks where the res lay outside of state territorial waters, *see Klein,* 568 F.Supp. 1562, 1565–68 (S.D.Fla.1983), *aff'd, Klein,* 758 F.2d at 1514; *Treasure Salvors, Inc. v. Abandoned Sailing Vessel Believed To Be The Nuestra Senora de Atocha,* 408 F.Supp. 907, 909 (S.D.Fla.1976), *aff'd,* 569 F.2d 330, 337 (5th Cir.1978), or when the state has waived its Eleventh Amendment immunity. *See, e.g., Chance,* 606 F.Supp. at 804–08. Accordingly, the present case presents a somewhat different factual scenario because the res is on state territory and there has been no waiver. Nonetheless we remain convinced that even if the Eleventh Amendment did not bar adjudication of title in this case, by application of the law of finds, JWI has no likelihood of success on its claim for title or full possession.

7. The State's claim to title of the res is based on federal and state statutes, as well as the Florida Constitution. The Florida Constitution delineates the State boundaries and declares that "[t]he title to lands under navigable waters, within the boundaries of the state, ... is held by the state, ... in trust for all the people." Fla. Const.

**1386**

Art. 10 § 11, *see also* Fla. Const. Art. 2 § 1. Also, under the Submerged Lands Act, 43 U.S.C. § 1301 *et seq.*, title to "the lands beneath navigable waters within the boundaries of the ... States ... and the right and power to manage, administer, lease, develop, and use the said lands and natural resources all in accordance with applicable State law be ... vested in and assigned to the respective States...." 43 U.S.C. § 1311(a). Section 1312 of Title 43 of the United States Code sets the seaward boundaries of States at a distance of three geographic miles. *See also* F.S.A. §§ 253.-03, 253.12. It is indisputable that the res lies within the boundary of Florida.

■ 8. Under the common law of finds, ownership of abandoned property is generally assigned

> without regard to where the property is found. Two exceptions to that rule are recognized: First, when the abandoned property is embedded in the soil, it belongs to the owner of the soil; Second, when the owner of the land where the property is found (whether on or embedded in the soil) has constructive possession of the property such that the property is not 'lost,' it belongs to the owner of the land.

*Klein,* 758 F.2d at 1514 (citations omitted). Here, there can be little doubt that under the embeddedness exception to the common law of finds, JWI does not have a likelihood of success on the merits as to its claim to title and possession of the res. While perhaps only some of the artifacts may be buried or partially buried, it is established

> that property need not be totally buried to satisfy the embeddedness requirement. What is affixed to the land belongs to the owner of that land.... [W]here a portion of a find is firmly affixed to the land, then even though other portions of it lie in loose surface soil, title to the entire find nevertheless rests with the land owner.

**4.** Florida Statute § 403.911(2) states:
The term 'dredging' means excavation, by any means, in waters. It also means the excavation, or creation, of a water body which is, or

*Chance,* 606 F.Supp. at 806–07. Clearly, the res is embedded in soil which is owned by the state. Given this conclusion, it is unnecessary for the resolution of the pending motion to determine whether Florida has the power and intention to exercise dominion and control over the res so that constructive possession may be inferred. *See Klein,* 758 F.2d at 1514.

9. Assuming *arguendo,* that the Eleventh Amendment does not bar the adjudication of title in this action, and the law of finds is inapplicable, we consider JWI's preemption argument. Pursuant to its assertion of ownership Florida has enacted various statutes in furtherance of the management of its natural and historic resources. Florida Statute section 403.913(1) states that "[n]o person shall dredge ... on, or over surface waters without a permit from the [Department of Environmental Regulation]...."⁴ *See also* F.S.A. § 253.04 (duty of Board of Trustees to protect state lands); F.S.A. § 253.77 (permission of Board of Trustees required in order to excavate land in which title has been vested in Board of Trustees); F.S.A. § 403.161(1)(b) (failure to obtain required permit creates civil liability under F.S.A. § 403.141). Also,

> [i]t is ... declared to be the public policy of the state that all treasure trove, artifacts, and such objects having intrinsic or historical and archeological value which have been abandoned on state-owned lands or state-owned sovereignty submerged lands shall belong to the state and the title thereto vested in the Division of Historical Resources of the Department of State for the purposes of administration and protection.

F.S.A. § 267.061(1)(b). Accordingly, the State requires that permits be obtained for the research of historic sites on state lands, F.S.A. § 267.12(1), and the specimens collected by such research "belong to the state with the title vested in the [DHR] for the purpose of administration and protection." F.S.A. § 267.12(3). *See also*

is to be, connected to waters, directly or via an excavated water body or series of excavated water bodies.

§ 267.13 (penalties for violation of permit requirement). JWI contends that this statutory scheme impermissibly interferes with federal salvage law.

10. The basis of Plaintiff's contention is that these statutes work to prevent the salvage of the res arrested pursuant to this Court's admiralty jurisdiction and therefore impermissibly conflict with federal salvage law. "In its simplest form salvage can be described as a service voluntarily rendered in relieving property from an impending peril at sea or other navigable waters by those under no legal obligation to do so." M. Norris, *Law of Salvage* § 2, at 2 (1958); *see also* G. Gilmore & C. Black, *The Law of Admiralty* § 8–1 (1975). The law of salvage can be "traced to the Rhodian laws ...," M. Norris, *supra*, § 1, at 1, has been recognized throughout our history, *see, e.g., Andrews v. Wall,* 44 U.S. (3 How.) 568, 11 L.Ed. 729 (1844), and is codified in the Salvage Act of 1912.[5] 37 Stat. 242 (1912) (*codified at* 46 U.S.C. §§ 721–727 & §§ 729–731). In its pre-emption argument JWI relies on the caselaw which has established salvage actions as within the exclusive province of the federal courts, *see e.g., Cobb Coin I,* and the Salvage Act of 1912, specifically 46 U.S.C. section 722,[6] as well as 43 U.S.C. section 1301, and 19 U.S.C. section 1310[7]. Read as a whole, JWI contends that under the Supremacy Clause, these federal laws render the Florida licensing scheme nugatory.

11. Recently, in *California Federal Savings and Loan Assn. v. Guerra,* 479 U.S. 272, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987), the Supreme Court summarized the three different ways in which state laws may be pre-empted under the Supremacy Clause. Initially, it was noted that "[i]n determining whether a state statute is pre-empted by federal law ... our sole task is to ascertain the intent of Congress." *Id.* at 107 S.Ct. 689 (citations omitted). The Court then stated that pre-emption of state law may be explicit in the Act of Congress. *Id.* (*citing e.g., Jones v. Rath Packing Co.,* 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977)). In the present case there is no suggestion that the law of salvage expressly preempts state regulation of the use of its land.

"Second, congressional intent to pre-empt state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." *Id.* (*quoting Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). As a third alternative, state law may be pre-empted where Congress has not completely displaced state regulation but "a conflict occurs either because 'compliance with both federal and state regulations is a physical impossibility,' or because the state law stands 'as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress.'" *Id.* (*quoting Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963) and *Hines v. Davidowitz,* 312 U.S. 52, 67, 61

---

**5.** Section 724 of Title 46 U.S.C. concerns the licensing of "wreckers" on the coast of Florida. It has been held that

The business of searching for and recovery from the bottom of the sea, treasure and artifacts lost centuries ago is not the business of saving property shipwrecked and in distress and is, therefore, not the business contemplated by the Act requiring a license.

*In re Andrews,* 266 F.Supp. 162, 165 (M.D.Fla. 1967).

**6.** Section 722 of Title 46 U.S.C. states:

All property, of any description whatsoever, which shall be taken from any wreck, from the sea, or from any of the keys and shoals, within the jurisdiction of the United States, on the coast of Florida, shall be brought to some

port of entry within the jurisdiction of the United States.

**7.** Section 1310 of Title 19 U.S.C. states:

Whenever any vessel laden with merchandise, in whole or in part subject to duty, has been sunk in any river, harbor, bay, or waters subject to the jurisdiction of the United States, and within its limits, for the period of two years and is abandoned by the owner thereof, any person who may raise such vessel shall be permitted to bring any merchandise recovered therefrom into the port nearest to the place where such vessel was so raised free from the payment of any duty thereupon, but under such regulations as the Secretary of the Treasury may prescribe.

S.Ct. 399, 404, 85 L.Ed. 581 (1941)) (other citations omitted). It is important to note that "[p]re-emption of state law by federal statute or regulation is not favored 'in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or the Congress has unmistakably so ordained.'" *Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981) (*quoting Florida Lime & Avocado Growers, Inc.*, 373 U.S. at 142, 83 S.Ct. at 1217).

■ 12. There can be little doubt that the federal law of salvage is not meant to implicitly pre-empt the state power to regulate the use of its lands by establishing permit and licensing requirements. The Supreme Court has stated that "[e]ven though Congress has acted in the admiralty area, state regulation is permissable, absent a clear conflict with federal law." *Askew v. American Waterways Operators, Inc.*, 411 U.S. 325, 341, 93 S.Ct. 1590, 1600, 36 L.Ed.2d 280 (1973). In *Just v. Chambers*, 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903 (1941), the Supreme Court recognized that

> a State, in the exercise of its police power, may establish rules applicable on land and water within its limits, even though these rules incidentally affect maritime affairs, provided that the state action "does not contravene any acts of Congress, nor work any prejudice to the characteristic features of the maritime law, nor interfere with its proper harmony and uniformity in its international and interstate relations."

*Id.* at 389, 61 S.Ct. at 692 (*quoting The City of Norwalk*, 55 F. 98, 106 (S.D.N.Y. 1893)); *see also Askew*, 411 U.S. at 338–40, 93 S.Ct. at 1598–99; *Subaqueous Exploration and Archeology, Ltd.*, 577 F.Supp. at 610 (*quoting Askew* and collecting cases). Of course, the Florida statutes affect JWI's ability to conduct a salvage operation. Accordingly, we must determine whether the state regulatory scheme presents a clear conflict with or necessarily prohibits compliance with federal law, or otherwise works to interfere with a characteristic feature of the application of maritime law.

■ 13. As we have observed, *supra*, the law of salvage is based on the premise that the owner of property abandoned at sea has not been divested of title. The law works to create an incentive for the rescue of imperiled property by granting an award for its salvage.

> The performance of salvage services, like the furnishing of other services to a ship, gives rise to a maritime lien. Thus, a salvor may assert his right to a salvage award either in an in rem proceeding against the salved vessel or cargo or in an in personam proceeding against the owner of the salved property. Awards for performance of salvage services are not limited to a strict quantum meruit measure of the value of the services performed. Rather, the award is calculated to include a bounty or premium based upon the risk involved in the operation and the skill with which it was performed.

*Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel*, 640 F.2d 560, 567 (5th Cir.1981) (citations omitted) (*Treasure Salvors II*); *see also* G. Gilmore & C. Black, *supra*, § 8–1, at 532 (no similar incentive exists "on land" to save another's property or life). The statutes that vest title of the res with the State of Florida do not conflict with federal law because the law of salvage specifically comtemplates that the vessel's owner remains in existence. While the effect of these statutes may be to alter the ultimate determination of the identity of the owner of the abandoned property, they do not alter the manner in which salvage law *operates*. The basic underlying premise of salvage law—the fiction of ownership—is not disturbed by the statutory scheme. From the assumption that the owner of this abandoned vessel is in existence, *cf. Treasure Salvors I*, 569 F.2d at 337 (absurd to assume that the owner of an historic shipwreck is in existence, and therefore law of finds should be applied), the conclusion necessarily follows that the "owner" may control the manner in which the property is

salved. *See Platoro Ltd., Inc.*, 695 F.2d at 901. Accordingly, the state statutory scheme does not work to conflict with characteristic features of salvage law, such as the incentive to rescue and the availability of reward; rather the statutes must be viewed as simply reflecting the "owner's" will with regard to the disposition of its property.[8]

■ JWI's reliance on the *Cobb Coin* cases is not persuasive. In *Cobb Coin I,* the court found that

> [t]he Florida statute is inconsistent with the paramount maritime law of salvage in at least three respects: (1) it limits the right to explore navigable waters to search for salvageable sites to its licensees; (2) it permits 'salvors' to work a sight exclusively notwithstanding a lack of diligence or success; and (3) it provides a fixed method of compensation in contrast to admiralty's flexible method of remuneration based on risk and merit.

*Cobb Coin Co. v. Unidentified, Wrecked & Abandoned Sailing Vessel,* 549 F.Supp. 540, 553 (S.D.Fla.1982) (*Cobb Coin II*) (*citing Cobb Coin I* at 203–08). Generally, these cases found that the state statutes were pre-empted by federal law because the licensing requirements gave the state the power to determine who may act as a salvor, and the manner of compensation effectively destroying the "incentive" feature of salvage law. While it must be recognized that the rights of *potential* salvors may be limited by the statutory scheme, at best these rights must be viewed as inchoate until an abandoned vessel is actually found and a salvage action commenced. Even at that point, however, the owner is not divested of its interest in the vessel. It retains title to the res subject only to a maritime lien for the salvage services. G. Gilmore & C. Black, *supra* § 8–2, at 535–36 & n. 11. Also, an owner may refuse salvage services, *id.*, § 8–2, at 536 & n. 12, and "[a] salvage award may be denied if the salvor forces its services on a vessel despite rejection of them by a person with authority over the vessel." *Platoro Ltd., Inc.*, 695 F.2d at 901 (citations omitted); *see also Klein,* 758 F.2d at 1515. Accordingly, "potential salvors" do not have any inherent right to save distressed vessels. Their activities must be subject to the owner's acquiesence.

Recognition of the fiction of ownership which underlies salvage law, and Florida's colorable claim to title, compels the conclusion that rather than conflicting with federal law, the state licensing requirements are consonant with the purposes of salvage law. A finding that the state statutes are pre-empted would be to subordinate the rights of the "owner" to those of the "salvor." Such a result is not contemplated by the federal law. While we need not reach the merits of the ownership claim or the appropriateness of a salvage award, in this context we cannot find that the State of Florida *must allow* the property salved. While the State statutory scheme undoubtedly restricts one's ability to search for wrecks and recover their bounty, we cannot find that it removes any essential feature of salvage law or interferes with its uniform application. The State statute limits the utility of salvage law when the res is located in state waters. However, the police power of Florida to regulate the use of its land by establishing licensing requirements for dredging on state lands and for the research of historic artifacts on its lands has not been taken away from the State by federal salvage law. The principles of salvage law, as developed through the cases and by statute, have not stripped the State of the fundamental power to administer the use of its land.

Moreover, in the *Cobb Coin* cases the court was not squarely faced with the Eleventh Amendment issues as framed in the instant action. The ruling on the motion for preliminary injunction, in *Cobb Coin I,*

---

8. Again, we emphasize that we make no finding as to the issue of the State's ownership of the res. For the purposes of JWI's pre-emption argument, we merely recognize that the operation of the State's statutes that vest ownership of the land and property with the State are consistent with the fundamental premise in salvage law that *an owner of the res exists.* In testing the validity of the statutes, we are simply assuming *arguendo* that they would work to give the State title, and do not make any determination in that regard.

was made without the benefit of the Supreme Court's decision in *Treasure Salvors, supra.* Then, in *Cobb Coin II,* while the court determined that the Eleventh Amendment did not bar the action because it was an *in rem* action and because the state statutes were preempted by federal law, *Cobb Coin II,* 549 F.Supp. at 551–52, that ruling was also based on the rationale that "Florida has consented to a determination of its rights by intervening in this lawsuit and subjecting its ownership claim for the Court's adjudication." *Id.* at 554. Here, we have no similar waiver of sovereign immunity.

Further, we agree with Judge Ramsey "that there is no comprehensive federal statutory scheme regulating the recovery of marine antiquities from state submerged lands...." *Subaqueous Exploration,* 577 F.Supp. at 610. Florida Statute section 267.061, which vests title in the state to historical artifacts is not in direct conflict with the Antiquities Act, 16 U.S.C. §§ 431–433, the Abandoned Property Act, 40 U.S.C. § 310, or the Marine Protection, Research, and Sanctuaries Act, 16 U.S.C. §§ 1431–1434. *See id.*

14. Our determination that JWI is without the likelihood of success on the merits of its claim to title and full possession precludes the entry of a preliminary injunction. "[I]t is [therefore] unnecessary to address the other prerequisites to such relief." *Jefferson County,* 720 F.2d at 1519. However, in order to create a full record we shall briefly consider the other elements.

15. The consideration of irreparable injury is, of course, inextricably bound with the question of ownership. Absent an ownership interest, the ultimate fate of the treasure is without any import to JWI, and its loss would not amount to an irreparable injury to that party. For the purposes of this analysis, however, we recognize that the vessel is in "marine peril." "Marine peril includes more than the threat of storm, fire, or piracy to a vessel in navigation.... Even after discovery of the vessel's location it is still in peril of being lost through the actions of the elements."

*Treasure Salvors I,* 569 F.2d at 337 (footnote and citation omitted); *see also Klein,* 758 F.2d at 1516 (Kravitch, J., specially concurring in part and dissenting in part); *Platoro, Ltd., Inc.,* 695 F.2d at 901 & n. 9; *Platoro Ltd., Inc. v. Unidentified Remains of a Vessel,* 614 F.2d 1051, 1055 & nn. 8 & 9 (5th Cir.), *cert. denied,* 449 U.S. 901, 101 S.Ct. 272, 66 L.Ed.2d 131 (1980); *Cobb Coin II,* 549 F.Supp. at 557; *cf. MDM Salvage, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel,* 631 F.Supp. 308, 312–13 (S.D.Fla.1986). Therefore, the theoretical loss to JWI by the State's prevention of the salvage activity would be irreparable. The historical value and the unknown quantity of coins made of precious metals, as well as other artifacts, makes it evident that monetary damages could not possibly make whole a party ultimately entitled to these antiquities for their loss. *See Cate v. Oldham,* 707 F.2d 1176, 1189 (11th Cir.1983) ("An injury is 'irreparable' only if it cannot be undone through monetary remedies.").

16. The final two considerations for preliminary injunctive relief require a court to weigh the relative injury to the parties as well as any public harm. As stated at the outset, this case presents fundamental questions of federalism. To the extent we find that the application of the Eleventh Amendment controls this case, considerations of comity prevent this Court from determining that the interests of the State of Florida are either outweighed by any threatened harm to JWI, or are inconsistent with "public policy."

**B.** *Motion to Remand*

17. The complaint in the removed action avers that the State of Florida has title to and control of the subject lands pursuant to the Florida Constitution, Article 10, Section 11, and Florida Statutes sections 253.03, 253.12, 370.03. Accordingly, the State asserted that under Florida Statute section 253.04 "[n]o person may trespass, damage or cause depredation upon the lands owned by the State of Florida." [Complaint ¶ 16], and that before submerged lands owned by the State may be used, a permit must be

granted by the Board of Trustees. [*Id.* at ¶ 17]. Further, the complaint asserts that JWI's excavation constitutes dredging, F.S.A. § 403.911(2), and that in order to engage in such activity a permit is required. F.S.A. § 403.913(1). Finally, the Complaint asserts that pursuant to Fla. Stat. § 267.061, the State has asserted title to the treasure trove located within the state-owned submerged lands, and that a permit is required to look for and excavate historic artifacts on state owned land. F.S.A. § 267.12. The State asserts that JWI is in violation of these statutes and that injunctive relief and the imposition of civil penalties is appropriate.

On August 24, 1987 JWI removed the action to federal court. 28 U.S.C. § 1441. The jurisdictional basis for removal was the assertion that the salvage activity is being carried out within the exclusive admiralty jurisdiction of the United States District Court. U.S. Const. Art. III § 2; 28 U.S.C. § 1333. JWI further contends that under the pre-emption doctrine, and the precedent of the *Cobb Coin* litigation, *see Cobb Coin II, supra; Cobb Coin I, supra,* admiralty or federal question jurisdiction is present. *See* 46 U.S.C. § 721 *et seq.;* 43 U.S.C. § 1301; 19 U.S.C. § 1310.

18. Title 28 U.S.C. § 1441 provides that actions brought in a State court may be removed by the defendant to the District Court of the United States when the District Court has original jurisdiction over the matter. Therefore, in order for removal to be proper, there must exist an independent basis for this Court to assert subject-matter jurisdiction. We will examine each purported basis of jurisdiction in turn.

B(1) *Admiralty Jurisdiction*

19. Article III, section 2, clause 1 of the Constitution contains a specific jurisdictional grant to the federal courts to "all cases of admiralty and maritime jurisdiction."

The implementing legislation of that grant, 28 U.S.C. section 1333, provides:

The district courts shall have original jurisdiction, exclusive of the courts of the States, of:

(1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.

(2) Any prize brought into the United States and all proceedings for the condemnation of property taken as prize.

We must determine whether the state court complaint implicates the federal court's exclusive jurisdiction over admiralty cases.

It is patent that underlying the complaint in the removed action is the conduct of a party who has properly invoked the federal court's admiralty jurisdiction in the *in rem* action. The question is whether the State of Florida can in essence "end run" this Court's jurisdiction and contest JWI's conduct in state court; or whether an enforcement action, related to a salvage action can properly be heard in a federal forum.[9]

20. As noted by one commentator "the 'exclusiveness' of the admiralty jurisdiction was, from the beginning, somewhat illusory." 7A *Moore's Federal Practice* ¶ .210, at 2201 (2d ed. 1988). Federal admiralty jurisdiction is concurrent with the state's where

[t]he "savings to suitors" clause leaves state courts competent to adjudicate maritime causes of action in proceedings *in personam* and means that "a state 'having concurrent jurisdiction, is free to adopt such remedies and to attach to them such incidents, as it sees fit' so long as it does not attempt to [give *in rem* remedies or] make changes in the 'substantive maritime law.'"

*Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 222, 106 S.Ct. 2485, 2495, 91 L.Ed.2d 174 (1986) (*quoting Madruga v. Superior Court,* 346 U.S. 556, 560–61, 74

---

9. The Florida licensing requirements are meant, in part, to prevent unauthorized dredging of State lands. The Supreme Court has noted that "[h]istorically, damages to the shore or to shore facilities were not cognizable in admiralty." *Askew v. American Waterways Operators, Inc.,* 411 U.S. 325, 340, 93 S.Ct. 1590, 1599, 36 L.Ed.2d

280 (1973) (citations omitted). While Congress has extended the boundary of admiralty jurisdiction "it hardly follows … that we must sanctify the federal courts with exclusive jurisdiction to the exclusion of powers traditionally within the competence of the States." *Id.* at 341, 93 S.Ct. at 1600.

S.Ct. 298, 300–01, 98 L.Ed. 290 (1954) (*quoting Red Cross Line v. Atlantic Fruit Co.*, 264 U.S. 109, 124, 44 S.Ct. 274, 277, 68 L.Ed. 582 (1924))); *see also Romero v. International Terminal Operating Co.*, 358 U.S. 354, 373–74, 79 S.Ct. 468, 480–81, 3 L.Ed.2d 368 (1959). The case commenced in state court is an *in personam* action. Therefore, the question of the presence of exclusive federal admiralty jurisdiction presents a two-pronged inquiry: first, whether the remedy sought is one *in rem;* or second, whether enforcement of the state law works to alter maritime law.

Of course, when looking behind the complaint we see the res which is the subject of the *in rem* action and must acknowledge that it is bound to the removed action. *Madruga, supra*, provides some guidance as to whether the fact that the res is the object of the state action means that the action actually is one *in rem.* In *Madruga*, an action for the sale and partition of a vessel was originally brought in state court. The defendant challenged the court's jurisdiction on the ground that only United States District Courts, sitting in admiralty, could assert jurisdiction in such a case. In construing the "savings to suitors clause," the Court stated that

> Admiralty's jurisdiction is 'exclusive' only as to those maritime causes of action begun and carried on as proceedings *in rem*.... But the jurisdictional act does leave state courts 'competent' to adjudicate maritime causes of action in proceedings *in personam*, ...

*Magdura*, 346 U.S. at 560, 74 S.Ct. at 300 (citation omitted). There, the Court found that since the state court proceedings affected only the interests of the parties in the vessel and not the world at large,[10] the state court had appropriately exercised jurisdiction over the cause. *Magdura*, 346 U.S. at 561, 74 S.Ct. at 301.

■ In the present case, as noted above, the action was brought *in personam*, and affects only the parties to the suit. That is, the State's remedy, if appropriate, would prevent only JWI from excavating the submerged lands owned by the State. While it will also have the ancillary effect of preventing salvage of the wreck, we find that under *Magdura*, this factor alone cannot confer subject-matter jurisdiction upon this Court because the state court remedy would be *in personam*.

21. Further, we do not find that we may assume jurisdiction pursuant to 28 U.S.C. § 1333 because the state laws effectively alter federal maritime law. "Critical to a complete understanding of the interplay of state and federal law in admiralty is the crucial recognition that maritime law seeks to respect and accomodate the regulatory powers of the States...." *Comind, Companhia de Seguros v. Sikorsky Aircraft Division of United Technologies Corp.*, 116 F.R.D. 397, 425 (D.Conn.1987) (*citing Romero*, 358 U.S. at 373–74, 79 S.Ct. at 480–81). Accordingly, state remedies and rules that take effect within the context of maritime cases have been upheld in a wide variety of contexts. *See generally, Romero*, 358 U.S. at 373 & nn. 34–40, 79 S.Ct. at

---

**10.** An interpretation of the state court proceeding in *Madruga* which would have supported JWI's position here simply did not win the support of a majority of the Supreme Court. In dissent, Justice Frankfurter forcefully argued that the Court should look behind the pleadings to the realities of the controversy.

> If this is not an action against a thing, in the sense in which that has meaning in the law, then the concepts of a *res* and an *in rem* proceeding have an esoteric meaning which I do not understand. From the terms of the complaint for partition through the opinion of this Court authorizing the State court to grant it, there is not the remotest suggestion that we are dealing with a remedy to enforce a separate underlying personal claim. Here the ship's the thing—not a claim outside the ship

for which an ancillary remedy against the ship is sought. *Cf. Knapp, Stout & Co. v. McCaffrey*, 177 U.S. 638 [20 S.Ct. 824, 44 L.Ed. 921 (1900) ]. Is it to be doubted that if California procedure required the proceeding to be brought by name against the Oil Screw Vessel Liberty, Official No. 256332, or if the action had in fact been so entitled, it would inescapably be deemed an action *in rem*? To make the existence of State power depend on such tenuous formalities is to make questions of jurisdiction in matters maritime, as between federal and State courts, turn on distinctions much too frail.

*Madruga*, 346 U.S. at 564–65, 74 S.Ct. at 303 (Frankfurter, J., dissenting). Of course, we are bound to follow the bright-line rule adopted by a majority of the Supreme Court.

480 & nn. 34–40. However, "state law must yield to the needs of a uniform federal maritime law...." *Id.* at 373, 79 S.Ct. at 480.

 We have found that the state statutes are not pre-empted by salvage law. Specifically, the characteristic features of continued ownership of the distressed vessel, an incentive for rescue, and the availability of a salvage award remain intact. However, our recognition that the State may assert ownership in the vessel by virtue of its dominion over the territory in which the res rests, necessarily indicates that the State may control the manner in which the res is salved. Accordingly, the salvage of an historic vessel may proceed on differing courses depending on whether the res is found in State waters or the high seas. That result, rather than indicating that salvage law is being applied inconsistently because of the state statutes, is merely a recognition that when the identity of the owner is known, that entity can effectively interfere with one's "right" to salvage. We are therefore unconvinced that an enforcement action based upon a state licensing scheme, such as we have here, encroaches on any existing federal admiralty policy. *See also* pre-emption discussion *supra.*

 Considerations of comity militate against federal courts asserting jurisdiction because an admiralty issue may be implicated. Under the savings to suitors clause of 28 U.S.C. § 1333 the removed action does not state a claim of which the district court has exclusive jurisdiction. "[F]ederal district courts are bound to refuse jurisdiction to maritime claimants, who do not invoke the district court's admiralty jurisdiction, unless there is an independent ground of federal jurisdiction, such as diversity or some specific statutory grant...." 7A *Moore's Federal Practice* ¶ .210, at 2209. Here, JWI has not invoked this Court's admiralty jurisdiction in the removed action.

### B(2) *Federal Question Jurisdiction*

 22. Alternatively, Plaintiff contends that removal is appropriate here because the complaint filed in state court presents a federal question. We disagree. It is axiomatic that for federal question jurisdiction to exist, the federal question must appear on the face of a well-pleaded complaint. *See, e.g., Gully v. First National Bank in Meridian*, 299 U.S. 109, 113, 57 S.Ct. 96, 98, 81 L.Ed. 70 (1936). Moreover, federal jurisdiction may not be founded upon a defense based on federal law, *Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908), or because the cause of action raised in the complaint is preempted by federal law. *Franchise Tax Board of State of California v. Construction Laborers Vacation Trust for Southern California*, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed. 2d 420 (1983). The complaint filed in the removed action relies solely on state law for the remedies sought. To the extent JWI asserts that the Complaint rests on substantive admiralty law, removal is nonetheless inappropriate. First, we have rejected, *supra*, the contention that the federal district court has exclusive admiralty jurisdiction over the action. Second, to the extent JWI may be implying that admiralty jurisdiction is a subset of federal question jurisdiction, and therefore removal is appropriate because subject matter jurisdiction exists pursuant to 28 U.S.C. section 1331, the Supreme Court rejected that argument long ago in *Romero, supra.*

"Of Course, all cases to which 'judicial power' extends 'arise,' in a comprehensive, non-jurisdictional sense of the term, 'under this Constitution.'" *Romero*, 358 U.S. at 368, 79 S.Ct. at 478. However, after an exhaustive survey of the relationship between admiralty jurisdiction and federal question jurisdiction, *id.* at 359–380, 79 S.Ct. at 473–85, Justice Frankfurter, writing for the Court, concluded in *Romero* that they were separate and distinct jurisdictional grants. This decision was based, in part, on the recognition that

> [n]ot only would the infusion of general maritime jurisdiction into the Act of 1875 disregard the obvious construction of that statute. Important difficulties of judicial policy would flow from such an

**1394**

interpretation, an interpretation which would have a disruptive effect on the traditional allocation of power over maritime affairs in our federal system.

Thus the historic option of a maritime suitor pursuing a common-law remedy to select his forum, state or federal, would be taken away by an expanded view of § 1331, since saving-clause actions would then be freely removable under § 1441 of Title 28.

*Id.* at 371–72, 79 S.Ct. at 479–80 (footnotes omitted). Accordingly, JWI's contention that federal question jurisdiction exists because of the underlying admiralty action must fail.

Finally, Defendant contends that federal statutes, 46 U.S.C. section 722, 19 U.S.C. section 1310, and 43 U.S.C. section 1301 control the disposition of this case. However, it is evident from the face of the complaint the Plaintiff's cause of action does not arise from these federal laws. They simply do not appear in the Complaint. Even if these laws were to provide a defense or preempt state law, they still would not form a basis for the removal of the action. The complaint in the state action simply does not arise under federal law. *See, e.g., Gully, supra; Mottley, supra, Osborn v. Bank of the United States,* 22 U.S. (9 Wheat) 738, 6 L.Ed. 204 (1824); *T.B. Harms Co. v. Eliscu,* 339 F.2d 823 (2d Cir.1964). Accordingly, it is hereby

ORDERED AND ADJUDGED as follows:

1. JWI's motion for preliminary injunction in case 87–8548–CIV–MARCUS is GRANTED to the extent that JWI seeks relief as against any persons or entities other than the State, and DENIED to the extent that JWI seeks relief as against the State.

2. The State's motion for remand in case 87–8619–CIV–MARCUS is GRANTED.