Harry ZYCH, d/b/a American Diving and Salvage Co., Plaintiff,

v.

The UNIDENTIFIED, WRECKED AND ABANDONED VESSEL, BELIEVED TO BE the SB "LADY ELGIN," Defendant.

Harry ZYCH, d/b/a American Diving and Salvage Co., Plaintiff,

v.

The UNIDENTIFIED, WRECKED AND ABANDONED VESSEL, BELIEVED TO BE the SB "SEABIRD," Defendant.

Nos. 89 C 6501, 89 C 6502.

United States District Court, N.D. Illinois, E.D.

Sept. 13, 1990.

Paul N. Keller, Park Ridge, Ill., Lenore E. McQuilling, Walker & Corsa, New York City, for plaintiff.

James R. Carroll, William K. Kane, Asst. Atty. Gen., General Law Div., Chicago, Ill., Linda A. Wawzenski, Asst. U.S. Atty., Debra J. Kossow, U.S. Dept. of Justice, Torts Branch, Civil Div., Washington, D.C., for U.S.

David A. Doheny, Andrea C. Ferster, Thompson M. Mayes, Elizabeth S. Merritt, National Trust for Historic Preserv., Washington, D.C., for The National Trust for Historic Preservation in the United States.

## MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

### I.  INTRODUCTION

The *Lady Elgin*, built in 1851, was a celebrated sidewheel steamer which carried passengers, mail and freight on Lake Michigan and Lake Superior.  On September 8, 1860, she was overloaded with approximately 450 passengers returning to Milwaukee after attending a Democratic Party rally in Chicago for presidential candidate Stephen Douglas.  A violent storm arose, decreasing the visibility, and she was fatally rammed by the lumber schooner *Augusta*.  She sank soon afterwards in what is perhaps the most famous shipwreck in the history of the Great Lakes.[1]  At least 100 passengers were saved, but some 300 perished in the calamity.  Those who went down with the ship included so many Irish political activists that the sinking has been credited with transferring the balance of power in Milwaukee from the Irish to the Germans.

Diving enthusiasts have vied for years to become the discoverer of the *Lady Elgin*'s remains, but until recently Lake Michigan refused to give up her treasure.  In 1989, however, after 16 years of searching, plaintiff Harry Zych, who owns and operates American Diving and Salvage Company, discovered what he believes is the wreck of the *Lady Elgin*.  He then filed an *in rem* complaint in this Court seeking ownership of her remains or, alternatively, a salvage award.

---

**1.** Even the United States Supreme Court has had occasion to comment on the wreck of the *Lady Elgin:* "The marine disasters upon these [Great] [L]akes, in consequence of the few natural harbors for the shelter of vessels, and the consequent losses of life and property, are immense.... The appalling destruction of life in the loss of the Erie upon Lake Erie, and of the Superior and Lady Elgin upon Michigan, are still fresh in the recollections of the country." *Moore v. American Transportation Co.,* 65 U.S. (24 How.) 1, 38, 16 L.Ed. 674 (1860).

On April 9, 1868, the *Seabird,* another sidewheel steamer which was carrying 100 passengers, sank in the waters of Lake Michigan. As described by author James L. Elliott:

> In late March of 1868, the *Seabird* was brought out of winter lay-up at Manitowoc and made ready for the coming summer season. She was given a thorough going over and freshly painted inside and out.
>
> During midmorning of April 8, 1868, she loaded passengers and freight for her first downbound trip of the new season. Her destination was Chicago with stops scheduled for Milwaukee, Racine, and Kenosha. Departure was at noon from Johnston's pier. Captain John Morris was in command.
>
> A news item and a small ad in the *Milwaukee Sentinel* on the morning of April 8, 1868, announced that the sidewheel steamer *Seabird,* Captain John Morris, would leave at 7:00 P.M. for Chicago inaugurating a new service for the season of 1868. The fare was $1.00, which was less than by railway, and there was no charge for staterooms.
>
> Everything went well on that first trip until *Seabird* was off Waukegan, a little after 6:00 A.M. on the morning of April 9. The night had been cold and the large stove in the main cabin had been kept going all night to provide some warmth and comfort for the passengers. As daylight came, the porter cleaned the fire in the cabin stove and then stepped to the rail to throw the still hot ashes over the side. Unfortunately he emptied his container into the wind and the hot ashes, fanned by the brisk northwesterly wind, blew back aboard and into the cargo stowed on the main deck. Some highly varnished tubs, packed in excelsior, were quickly ignited and the dread cry of "Fire!" swept the ship! As the flames made their way topside and into the cabin area they were fed by the newly painted woodwork and the entire steamer was soon engulfed in a mass of flame. There was no place for the terrified passengers and crew to go except over the side into the numbing cold waters of Lake Michigan. Survival in the 36–degree water lasted only a few minutes for most....
>
> Only two passengers were saved. They were A.C. Chamberlain and Edwin Henneberry, both from Sheboygan.

J. Elliott, *Red Stacks Over the Horizon* 41–43 (1967).

The remains of the *Seabird* lay hidden on the bed of Lake Michigan until they too were discovered by Zych in 1989. Zych then filed an *in rem* action seeking ownership of the *Seabird* or a salvage award.

The two cases were consolidated because they raised similar issues. Plaintiff moved for an order of default, but before that motion could be ruled on, the Illinois Department of Transportation and the Illinois Historic Preservation Society (collectively, "the State") intervened for the limited purpose of moving to dismiss the cases on the basis of the State's sovereign immunity guaranteed by the Eleventh Amendment of the U.S. Constitution. Plaintiff argued that the Eleventh Amendment did not bar the action, and that even if the Eleventh Amendment would otherwise bar the action, the State had waived its immunity. Plaintiff's arguments included a challenge to the constitutionality of the Abandoned Shipwreck Act of 1987, 43 U.S.C. §§ 2101 *et seq.* Accordingly, the United States intervened and submitted briefs defending the Act's constitutionality. Amicus briefs were also submitted by various interested parties.[2]

While the motion to dismiss was pending, plaintiff formed the Lady Elgin Foundation in order to pursue another avenue of gaining possession of the wreck. The Foundation reached an agreement with CIGNA Property & Casualty Company, which holds a claim of title to the wreck based on its insurance of the hull and cargo of the *Lady Elgin* and its payment on a claim by its insured. Pursuant to that agreement, CIG-

---

**2.** The American Sport Divers Association submitted an amicus brief on behalf of plaintiff. The National Trust for Historic Preservation in the United States submitted an amicus brief on behalf of the State.

NA transferred its ownership interest in the vessel to the Foundation in exchange for twenty percent of the proceeds of any artifacts recovered from the wreck and sold by the Foundation. After reaching this agreement, the Foundation moved to intervene in the *Lady Elgin* case for the purpose of joining in plaintiff's objections to the State's motion to dismiss. Because this development placed the *Lady Elgin* case in a very different posture than the *Seabird* case, the Court vacated its consolidation order.[3]

## II. APPLICABILITY OF ELEVENTH AMENDMENT

Analysis of the applicability of the Eleventh Amendment[4] in the context of an *in rem* action concerning a shipwreck is governed by the case of *Florida Department of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982). That case involved the wreck of a 17th-century Spanish galleon discovered in international waters off the coast of Florida. During litigation over title to the wreck, the plaintiff filed a motion for an order commanding the United States Marshal to arrest and take custody of artifacts which were in the possession of officials of the State of Florida. Florida opposed the motion on the ground of sovereign immunity.

A plurality of the Supreme Court stated that three questions must be answered in order to resolve the Eleventh Amendment issue:

> (a) Is this action asserted against officials of the State or is it an action brought directly against the State of Florida itself? (b) Does the challenged conduct of state officials constitute an ultra vires or unconstitutional withholding of property or merely a tortious interference with property rights? (c) Is the relief sought by Treasure Salvors

permissible prospective relief or is it analogous to a retroactive award that requires "the payment of funds from the state treasury"?

458 U.S. at 690, 102 S.Ct. at 3317. More specifically, an action is barred if it is directly against the state itself; if it challenges the conduct of state officials who have exercised legitimate authority; or if it seeks a retroactive award requiring payment of state funds. The Court held that the motion for arrest was not against the State itself but rather against state officials; that the action of those state officials was taken without legitimate authority; and that the arrest warrant did not seek any attachment of state funds and would impose no burden on the state treasury. *Id.* at 691–98, 102 S.Ct. at 3318–21. Accordingly, the Eleventh Amendment did not bar the arrest warrant. The Court held, however, that the Eleventh Amendment did bar federal judicial determination of the ownership issue itself. *Id.* at 700, 102 S.Ct. at 3322.

### A. Nature of Relief Sought

Because the third *Treasure Salvors* question—the nature of relief sought—is the most straightforward in this case, the Court addresses it first. In *Treasure Salvors,* the Court found that the relief sought by the plaintiff was permissible prospective relief which comported with the principles of *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). It noted that the arrest warrant in issue "sought possession of specific property" and "did not seek any attachment of state funds and would impose no burden on the state treasury." *Id.*, 458 U.S. at 698, 102 S.Ct. at 3321. The instant case is similar in all relevant aspects. Although the pending issue concerns the *in rem* action itself rather than an arrest warrant, in both

---

**3.** Pending at this time, but not yet fully briefed, is the Foundation's motion for leave to file an answer and claim of ownership.

**4.** The Eleventh Amendment states: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by

citizens or subjects of any foreign State." In *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), the Court held that, notwithstanding the amendment's restrictive language, the Eleventh Amendment applies as well to bar an action brought against a state by a citizen of that state.

cases the primary goal of the plaintiff is recovery of specific property. *See also Cobb Coin Company, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel ("Cobb Coin II")*, 549 F.Supp. 540, 554 (S.D.Fla.1982) (recovery sought in *in rem* action was consistent with Eleventh Amendment where award would be in form of artifacts rather than payment of funds from state treasury).

The State contends that the Court must look to plaintiff's request for a salvage award as an alternative form of relief if his claim to ownership of the property is denied. Citing *Platoro Ltd. v. Unidentified Remains of a Vessel*, 695 F.2d 893, 904 (5th Cir.), *cert. denied*, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983), the State further argues that a salvage award constitutes a monetary award against the state because a salvage award cannot be granted *in specie*, or in terms of the recovered artifacts themselves.

The Court finds this argument to be flawed in two respects. First, because the lawsuit seeks a salvage award only as an alternative request in case the primary relief is denied, the request for a salvage award is not determinative of the nature of the action. Second, the Court does not agree that a salvage award is necessarily the type of relief forbidden by the Eleventh Amendment. In *Platoro*, the issue was not whether a salvage award made the Eleventh Amendment applicable but rather whether the district court erred in ordering, as a salvage award, that the state either surrender the artifacts to the salvor or auction the artifacts and give the proceeds to the salvor. The Court stated that it could find no precedent in which "the salvage award was expressed in terms of the *res* rather than in dollars, except where the salvage award was made alternatively with an award of title to the *res* under the law of finds." 695 F.2d at 903–04. The court cited, as one example, *Treasure Salvors v. Unidentified Wrecked and Abandoned Sailing Vessel*, 569 F.2d 330, 337 (5th Cir.1978), in which the court expressly stated that "[s]alvage awards may include the entire derelict property." The validity of *Platoro's* statement is doubtful. For instance, in *Cobb Coin II*, the court stated: "[T]he appropriate form of [salvage] award in a case like this should differ from traditional awards. It should be given *in specie* because the property saved is uniquely and intrinsically valuable beyond its monetary value." 549 F.Supp. at 561. *See also* Owen, *Legal Troubles with Treasure*, 16 J.Mar.L. & Comm. 139, 170 (1985) ("An award may also be made *in specie*, and this is particularly suitable in treasure salvor cases."). In any event, plaintiff here does seek a salvage award only as an alternate form of relief, and even the logic of *Platoro* would suggest that a salvage award consisting of artifacts themselves would thus be permissible.

The State also argues that even if the lawsuit seeks only injunctive relief, it is barred by the Eleventh Amendment pursuant to *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). This argument is unpersuasive. *Pennhurst* concerned only actions in federal court seeking to compel state officials to conform their conduct to state law. Plaintiff's *in rem* complaint in this case does not rely on state law, and *Pennhurst* is therefore inapplicable.

The Court concludes that the form of relief sought by plaintiff is not inconsistent with the Eleventh Amendment.

### B. Action Against State

#### 1. Nature of Inquiry

In a case, such as this one, where the plaintiff has not challenged any specific action by state officials and the state seeks dismissal of the underlying *in rem* action, the three-question test set forth in *Treasure Salvors* must be altered somewhat. It no longer makes sense to ask the second question as framed in *Treasure Salvors*—whether the conduct of the state officials is ultra vires or unconstitutional. *See Cobb Coin II*, 549 F.Supp. at 551 ("Presumably, the second question is immaterial if the state officials are not named defendants."). However, this second question resurfaces in another form when courts attempt to answer the first question—

whether the suit is brought directly against the state. *In rem* suits to determine ownership of abandoned shipwrecks generally seek title against "all the world," including "states." Thus although they are not brought directly against states, they implicate states' interests in the same way they implicate the interests of any other possible claimants. The minority position, in answer to the first *Treasure Salvors* question, is that such an *in rem* action simply is not a suit brought directly against the state. *See Cobb Coin II*, 549 F.Supp. at 551–52.[5] *Cf. Sindia Expedition, Inc. v. Wrecked and Abandoned Vessel*, 895 F.2d 116 (3d Cir.1990).[6] More often courts ap-

pear to have assumed that actions seeking to determine ownership against "all the world" are, in effect, suits against states because states are included in the concept of "all the world." *See Fitzgerald v. Unidentified Wrecked and Abandoned Vessel*, 866 F.2d 16 (1st Cir.1989); *Maritime Underwater Surveys, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel*, 717 F.2d 6 (1st Cir.1983); *Jupiter Wreck, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel*, 691 F.Supp. 1377 (S.D.Fla.1988); *Subaqueous Exploration v. Unidentified, Wrecked and Abandoned Vessel*, 577 F.Supp. 597 (D.Md.1983). *See also Marx v. Government of Guam*, 866

---

**5.** The *Cobb Coin* court stated:

This is not a suit against the State or its officers. The plaintiff ... filed its *in rem* complaint invoking the admiralty jurisdiction of the United States District Court.... [T]his action is not against any State officers or against the State itself; it is an action in which the plaintiff seeks to have his federal rights under the general law of finds or the maritime law of salvage decided as to these artifacts which were admittedly beneath navigable waters. It is 'against' property which lay untouched and, from a legal standpoint, undiscovered before the plaintiff began this suit. The wrecked and abandoned sailing vessel is not in the possession of the State or any of its officers.... The State simply has not been sued here; it has voluntarily undertaken to enter this otherwise complete litigation. This suit is not against the State and is not barred by the Eleventh Amendment.

549 F.Supp. at 551–52.

**6.** In *Sindia* (a case which none of the parties brought to the Court's attention), the court held that an *in rem* action is not a suit against state, even assuming that the state has a colorable ownership interest. This Court rejects the *Sindia* court's analysis, which it views as contrary to the weight of the case law and as based on a misreading of *Treasure Salvors*. The *Sindia* court stated:

Justice Stevens, for the plurality, explained that a classic admiralty *in rem* action in which the plaintiffs claim only an ownership interest in property and are not seeking personal jurisdiction over the State by seizure of the vessel is not barred by the Eleventh Amendment. *See Treasure Salvors*, 458 U.S. at 699, 102 S.Ct. at 3322. On the other hand, an admiralty action brought *in rem* solely for the purpose of giving the court jurisdiction over a damage claim against a State is barred by the Eleventh Amendment. *Id.*

The passage in *Treasure Salvors* to which *Sindia* apparently refers comes in the Supreme Court's discussion of the third question—the nature of

the relief sought. The Supreme Court distinguished the case before it from *In re New York (I)*, 256 U.S. 490, 41 S.Ct. 588, 65 L.Ed. 1057 (1921), and *In re New York (II)*, 256 U.S. 503, 41 S.Ct. 592, 65 L.Ed. 1063 (1921), which involved attempts to collect damages from the state by instituting *in rem* proceedings against vessels. The Supreme Court stated:

In these (*New York*) cases the plaintiff did not claim an ownership interest in the vessels and did not question the State's assertion of ownership. The sole purpose of the attempted arrests was to enable the court to acquire jurisdiction over a damages claim that was otherwise barred by the Eleventh Amendment. In this case Treasure Salvors is not asserting a claim for damages against either the State of Florida or its officials. The present action is not an *in personam* action brought to recover damages from the State. The relief sought is not barred by the Eleventh Amendment.

458 U.S. at 699, 102 S.Ct. at 3322. Thus the Court held merely that the *relief* sought was permissible, after already finding that the state officials' claim to the property was not colorable. Furthermore, the relief referred to was not the relief sought by the underlying action—ownership against all the world—but rather the relief sought by the arrest warrant. The Supreme Court by no means held that the Eleventh Amendment permits *in rem* actions against property to which a state has a colorable claim of ownership.

Ultimately, however, the *Sindia* court's misreading of *Treasure Salvors* was harmless. *Sindia* could not avoid the plain holding of *Treasure Salvors*—although in light of *Sindia's* analysis it found this holding "curious"—that the question of the state's interest in the property could not be determined without its consent. 895 F.2d at 120. *Sindia* thus held that the action could go forward with respect to the competing claims of all claimants other than the state.

F.2d 294 (9th Cir.1989).[7] However, as these courts have implicitly recognized, if a particular state would have no colorable claim of title, then the lawsuit cannot legitimately be treated as an action against that state. In other words, for a state to show that it is a defendant and thus is entitled to assert sovereign immunity, the state must show that it has a colorable claim of ownership. *See* Owen, *Legal Troubles,* at 154. Thus, much as in the *Treasure Salvors* type of situation, where the court must ask whether the conduct of the state officials in asserting possession or ownership is legitimate, a court faced with a motion by a state to dismiss an *in rem* action on the basis of sovereign immunity must inquire whether the state's claim of ownership is colorable. The first two *Treasure Salvors* questions are thus collapsed. If the state's claim is colorable, the lawsuit is against the state; if the state's claim is not colorable, the lawsuit is not against the state.[8]

### 2. Colorable Claim

#### a. State Statutes

■ In support of its claim of ownership over the shipwrecks, the State first relies on a number of Illinois statutes. In other

---

**7.** Although the Court does not always agree with the precise reasoning employed in these cases, all of these cases illustrate the necessity of addressing the legitimacy of the state's claim in order to determine whether the action is brought directly against the state.

In *Subaqueous,* the court examined in detail the basis for the state's claim of ownership before finding: "The complaints specifically name the vessels as defendants therein. Consequently, these suits are directly against vessels over which the State of Maryland asserts a claim of title. As such, the essential nature and effect of these proceedings are that they are suits directly against the State of Maryland." 577 F.Supp. at 607. In *Jupiter,* the court similarly engaged in a detailed analysis of the state's claim in finding that the Eleventh Amendment barred the plaintiff from succeeding on its claim of ownership. 691 F.Supp. at 1384. In *Marx,* the court assumed, without holding, that a colorable claim on the part of the state was required in order to find that the case was barred by the Eleventh Amendment. 866 F.2d at 299. The court then found that the state's claim was colorable and held that the *in rem* action should have been dismissed for lack of jurisdiction. *Id.* at 301–02.

In *Maritime,* the court affirmed the dismissal of an *in rem* action on the basis of sovereign immunity. The court stated:

It is a suit by a corporate citizen of Delaware in all but form against the Commonwealth of Massachusetts. While the Commonwealth is not a named defendant, it is beyond cavil that Maritime recognized the state as its principal opponent. Maritime's prayer for relief seeks to enjoin *all* government agencies from interfering with its title. Unlike the *Treasure Salvors* plaintiff, moreover, Maritime demanded the compelled presence of "all ... states ... claiming an interest" in the vessel (emphasis supplied). It is self-evident that this demand was directed towards the Commonwealth. The ship lies within a quarter mile of the Massachusetts shoreline. The Commonwealth has asserted title to this and all other "underwater archeological resources" within its inland and coastal waters continuously since 1973. Mass.G.L. ch. 6 § 180. The Commonwealth is the only party to respond to Maritime's complaint and to the Warrant for Arrest in Rem. The courts are not blind to the real posture of the parties.

717 F.2d at 8. The analysis in *Fitzgerald* is similar.

The Court cannot agree with *Maritime's* emphasis on the plaintiff's subjective expectations concerning the likelihood that the state would be a claimant. To the extent that *Maritime* rested on plaintiff's identification of states and governmental agencies as included in the types of parties against whom it sought to assert ownership, this Court also cannot agree. Whether or not an *in rem* complaint expressly refers to "states" and "governmental agencies," it generally seeks title against "all the world." Questions of sovereign immunity should not turn on the legalese employed by the complaint to elaborate on the meaning of "all the world." Finally, this Court cannot agree with the later statement in *Maritime* that "[b]ecause this is not a claim against a named state official, and because of the Eleventh Amendment's flat prohibition of suits against states regardless of their merit, we need not reach the colorability of the Commonwealth's claim." 717 F.2d at 8. As the passage quoted above illustrates, the *Maritime* court did indeed appear to consider the colorability of the claim in determining that the action was one against the state. (Certainly the court would not have held that the suit was one against the State of, say, Wyoming, were there no colorable basis for a claim by Wyoming, even if Wyoming appeared to assert title.)

**8.** Engaging in this preliminary inquiry does not cross the line into an impermissible determination of the merits of the state's claim. Although *Treasure Salvors* forbade federal judicial adjudication of the state's right to the property, it permitted, as necessary to the Eleventh Amendment question, inquiry into the similar issue of the legitimacy of the conduct by the state officials.

cases, state statutes have been held to create a colorable claim of ownership by the state. Thus in *Treasure Salvors*, the state relied on Fla.Stat. § 267.061(1)(b), which provided:

> It is further declared to be the public policy of the state that all treasure trove, artifacts and such objects having intrinsic or historical and archeological value which have been abandoned on state-owned lands or state-owned sovereignty submerged lands shall belong to the state with the title thereto vested in the division of archives, history, and records management of the department of state for the purpose of administration and protection.

458 U.S. at 673–74, 102 S.Ct. at 3309. In *Subaqueous, supra,* the state's claim was based in part on § 2–309 of Maryland's Natural Resources Article, which provided that "[a]ny object or material of historical or archaeological value or interest found on an archeological site or land owned or controlled by the State is the property of the State." 577 F.Supp. at 606. In *Riebe v. Unidentified, Wrecked and Abandoned 18th Century Shipwreck,* 691 F.Supp. 923, 924 (E.D.N.C.1987), the court noted the existence of N.C.Gen.Stat. §§ 121–22, which declares that North Carolina has "title to all shipwrecks, vessels, cargoes, tackle, and underwater archaeological artifacts which have remained unclaimed for more than 10 years lying on the bottoms of navigable waters of the state." *See also Maritime, supra,* 717 F.2d at 8 (relying in part on Mass.G.L. ch. 6 § 180, which provides that "[t]itle to underwater archaeological resources located within the inland and coast-al waters of the commonwealth is hereby declared to be in the commonwealth," and defines "archaeological resources" as including "sunken ships, which have remained unclaimed for one hundred years or more").

The Illinois statutes identified by the State, however, do not grant the State an ownership interest in the shipwrecks. Unlike the statutes quoted above, they do not vest title in the State. For instance, the Rivers, Lakes and Streams Act provides in part:

> The Department of Transportation shall upon behalf of the State of Illinois, have jurisdiction and supervision over all of the rivers and lakes of the State of Illinois, wherein the State of Illinois or the people of the State have any rights or interests. . . .

Ill.Rev.Stat. ch. 19 ¶ 52. By its terms, this statute does not grant ownership to the State over anything which the State does not already own; it merely describes the powers and duties of a particular state agency.

The State also relies on the Human Grave Protection Law, Ill.Rev.Stat. ch. 127 §§ 2661 *et seq.* This statute contains no reference to ownership, title or possession. It merely provides for civil and criminal penalties against those who disturb human skeletal remains and grave artifacts. Whether or not the statute can be construed to apply to the remains of the *Lady Elgin* and the *Seabird,* it does not purport to give the State an ownership interest in those remains.[9]

---

**9.** Because the Court agrees with plaintiff that the state statutes do not confer ownership on the State, the Court does not reach plaintiff's alternative argument that the statutes are preempted by federal law.

The State also based its ownership claim on the Aboriginal Records and Antiquities Act, Ill. Rev.Stat.Ann. ch. 127 § 133c.01 *et seq.* When the briefs were submitted in this case, that statute applied to "aboriginal records and other antiquities, including mounds, earthworks, forts, burial and village sites, mines or other relics found upon or within any of the lands owned by or under the control of this State." Ill.Rev.Stat.Ann. ch. 127 § 133cl (1981). The court has serious doubts as to whether this language could be interpreted to include abandoned shipwrecks. However, during the pendency of the instant motions the statute was substantially revamped under the title "Archaeological and Paleontological Resources Protection Act." Ill.Rev.Stat.Ann. ch. 127 § 133c.01 (Supp.1990). In its present form, the Act specifically applies to shipwrecks. Ill.Rev.Stat.Ann. ch. 127 § 133c.02(a) (Supp.1990). Although the parties have had ample opportunity, they have not addressed the retroactivity of this amendment or sought leave to do so. In light of the Court's conclusion below that there are other colorable bases for the State's ownership claim, the Court does not reach the issue of whether an

### b. Common Law and the Submerged Lands Act

■ The Submerged Lands Act, 43 U.S.C. § 1311, makes clear that the states have title to all lands and natural resources beneath navigable waters within the boundaries of the respective states.[10] The State relies in part on this Act itself for its ownership claim, contending that the shipwrecks are "natural resources." The Court is unwilling to engage in such a stretch of the meaning of "natural resource;" a shipwreck is not "natural." *Cf. Cobb Coin Co. v. Unidentified, Wrecked and Abandoned Sailing Vessel ("Cobb Coin I")*, 525 F.Supp. 186, 214–16 (S.D.Fla. 1981) (Act applies only to natural resources and does not give states authority to assert claims over shipwrecks); *Commonwealth v. Maritime Underwater Surveys, Inc.*, 403 Mass. 501, 531 N.E.2d 549, 552–53 (1988) (Submerged Lands Act did not give state title to shipwrecks). The Act does, however, prove instrumental in giving the State a colorable ownership interest in the shipwrecks by making clear that the lake bed on which the shipwrecks lie belongs to the State.[11] With ownership of the lake bed established, the common law of finds gives the State a colorable claim of ownership to the shipwrecks found on that lake bed.

■ The law of finds generally provides that the first finder to take possession of lost or abandoned property with the intention to exercise control over it acquires title. *See Klein v. Unidentified Wrecked and Abandoned Sailing Vessel*, 758 F.2d 1511, 1514 (11th Cir.1985); *Jupiter Wreck, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel*, 691 F.Supp. 1377, 1386 (S.D.Fla.1988); *Chance v. Certain Artifacts Found and Salvaged from the Nashville*, 606 F.Supp. 801, 804 (S.D.Ga. 1984), *aff'd mem.*, 775 F.2d 302 (11th Cir. 1985). An exception applies, however, to vest title in the owner of the land if the property is found embedded in the land. *Klein*, 758 F.2d at 1514; *Jupiter Wreck*, 691 F.Supp. at 1386; *Chance*, 606 F.Supp. at 805. Abandoned shipwrecks are generally considered to be "embedded" in the submerged land. *See Klein*, 758 F.2d at 1514; *Jupiter Wreck*, 691 F.Supp. at 1386; *Chance*, 606 F.Supp. at 805–07. In this case, the State has contended that the shipwrecks are embedded in submerged land within the State's boundaries. Plaintiff has not contended otherwise, but argues that the State has no knowledge of whether the wrecks are embedded. In ruling on the State's motion to dismiss, the Court cannot determine title, but may only determine whether the State's claim of ownership is colorable. Considering the cases cited above, the shipwrecks are likely embedded in submerged lands which the State owns pursuant to the Submerged Lands Act, and the embeddedness exception of the common law of finds gives the State a colorable claim of ownership in the shipwrecks.[12]

ownership claim based on this statute would be colorable.

**10.** The Act provides, in part:
(a) ... It is hereby determined and declared to be in the public interest that (1) title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters, and (2) the right and power to manage, administer, lease, develop, and use the said lands and natural resources all in accordance with applicable State law be, and they are hereby, subject to the provisions hereof, recognized, confirmed, established, and vested in and assigned to the respective States or the persons who were on June 5, 1950, entitled thereto under the law of the respective States in which the land is located, and the respective grantees, lessees, or successors in interest thereof;

(b) ... (1) The United States hereby releases and relinquishes unto said States and persons aforesaid, except as otherwise reserved herein, all right, title, and interest of the United States, if any it has, in and to all said lands, improvements, and natural resources....

**11.** Plaintiff does not expressly state that the shipwreck is located within the State's boundaries. However, the complaint does assert that the shipwreck is located "within the territorial jurisdiction of this Court." Plaintiff also has not responded to the State's assertion that it is undisputed that the shipwreck lies within the State's boundaries.

**12.** It might be contended that the common law of salvage applies rather than the law of finds. Pursuant to the law of salvage, the provision of salvage services to an imperiled vessel gives rise

#### c. Abandoned Shipwreck Act

The State also contends that it has a colorable claim to ownership in the shipwrecks pursuant to the Abandoned Shipwreck Act, 43 U.S.C. § 2101 et seq. ("the ASA"). The heart of the ASA is 43 U.S.C. § 2105, which provides in part:

**(a) United States title**

The United States asserts title to any abandoned shipwreck that is—

(1) embedded in submerged lands of a State....

(2) embedded in coralline formations protected by a State on submerged lands of a State; or

(3) on submerged lands of a State and is included in or determined eligible for inclusion in the National Register.

**(b) Notice of shipwreck location; eligibility determination for inclusion in National Register of Historic Places**

The public shall be given adequate notice of the location of any shipwreck to which title is asserted under this section. The Secretary of the Interior, after consultation with the appropriate State Historic Preservation Officer, shall make a written determination that an abandoned shipwreck meets the criteria for eligibility for inclusion in the National Register of Historic Places under clause (a)(3).

**(c) Transfer of title to States**

The title of the United States to any abandoned shipwreck asserted under subsection (a) of this section is transferred to the State in or on whose submerged lands the shipwreck is located.

Also significant for purposes of this case is 43 U.S.C. § 2106(a), which provides, "The law of salvage and the law of finds shall not apply to abandoned shipwrecks to which section 2105 of this title applies."

Plaintiff has not argued that the ASA does not, by its terms, grant title of the vessels to the State.[13] Rather, plaintiff argues that the ASA is unconstitutional.

Article III, section 2 of the United States Constitution extends the judicial power to "all cases of admiralty and maritime jurisdiction." Based on this clause, courts have recognized two constitutional limits on Congress' ability to alter maritime law:

One is that there are boundaries to the maritime law and admiralty jurisdiction which inhere in those subjects and cannot

---

to a maritime lien. In order for the law of salvage to apply even when a vessel is abandoned, it is presumed that the property has not been divested of title. The property is sold by the court, and the salvor receives a portion of the proceeds as compensation. See Chance, 606 F.Supp. at 804.

The prevailing view is that in the context of historic, abandoned shipwrecks, the law of finds applies rather than the law of salvage. See Martha's Vineyard Scuba Headquarters, Inc. v. Unidentified Wrecked and Abandoned Steam Vessel, 833 F.2d 1059, 1065 (1st Cir.1987); Jupiter Wreck, 691 F.Supp. at 1385; Chance, 606 F.Supp. at 804; Subaqueous, 577 F.Supp. at 611. A salvage award provides an incentive to salvors and thus helps to protect the owner of the property against the loss of that property. See Jupiter Wreck, 691 F.Supp. at 1388. To apply the law of salvage, however, by creating the fiction of continuing ownership even after the property has long been abandoned is rather absurd, especially when the law of finds provides a rational method for determining rights in the property. See Treasure Salvors, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel, 569 F.2d 330, 336 (5th Cir.1978); Jupiter Wreck, 691 F.Supp. at 1385.

In any event, it appears that application of the law of salvage would often lead to the same result. Under the law of salvage, the owner of

the vessel may reject the salvage services, in which event the salvor is not entitled to an award. See Platoro, 695 F.2d at 901–02. In enacting § 2106, Congress specifically rejected salvage services on the vessels subject to the ASA. Furthermore, it is reasonable to interpret state preservation statutes which limit the ability of divers and salvors to explore or excavate abandoned shipwrecks as expressing a rejection of salvage services.

13. Section 2105(b) provides:

The public shall be given adequate notice of the location of any shipwreck to which title is asserted under this section. The Secretary of the Interior, after consultation with the appropriate State Historic Preservation Officer, shall make a written determination that an abandoned shipwreck meets the criteria for eligibility for inclusion in the National Register of Historic Places under clause (a)(3). (Emphasis added.) It might be argued that the ASA does not apply to a given shipwreck if the United States or the applicable state has not "asserted" title to the wreck nor given any public notice of its location. Plaintiff, however, does not raise this issue and the Court thus does not reach it.

be altered by legislation, as by excluding a thing falling clearly within them or including a thing falling clearly without. Another is that the spirit and purpose of the constitutional provision require that the enactments ... shall be co-extensive with and operate uniformly in the whole of the United States.

*Panama Ry. Co. v. Johnson*, 264 U.S. 375, 386–87, 44 S.Ct. 391, 394, 68 L.Ed. 748 (1924). *See also Hurst v. Triad Shipping Co.*, 554 F.2d 1237, 1244 (3d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977). Plaintiff argues that the ASA violates both of these principles.

■ **1) Exclusion from Admiralty Jurisdiction.** First, plaintiff argues that the ASA impermissibly excludes from federal jurisdiction a significant aspect of maritime law. He argues that the Constitution prohibits Congress from removing an entire class of maritime law from the jurisdiction of the federal courts. Although Congress may substantively alter maritime law, in doing so it "necessarily acts within a sphere restricted by the concept of the admiralty and maritime jurisdiction." *The Thomas Barlum*, 293 U.S. 21, 44, 55 S.Ct. 31, 38, 79 L.Ed. 176 (1934). The resolution of questions of title over abandoned shipwrecks is a significant, central element of traditional maritime law. The ASA, however, purports to simply decide questions of title and render maritime common law inapplicable. In doing so, plaintiff argues, Congress has intruded on the constitutional power of the judicial branch and violated the Constitution's designation of the federal courts as the arbiter of questions over title to abandoned shipwrecks.

The Court agrees with plaintiff that the law of finds and law of salvage are significant elements of traditional maritime law. The Court cannot agree, however, that the ASA has impermissibly interfered with federal admiralty jurisdiction. Plaintiff's argument confuses the issues of substantive law and jurisdiction. By including admiralty and maritime jurisdiction in the judicial

power, the Constitution has been interpreted as adopting for the United States the existing maritime common law, which could subsequently by modified be Congress within certain limits. *See, e.g., The Thomas Barlum*, 293 U.S. at 43, 55 S.Ct. at 38. However, the limitation on Congress' ability to interfere with federal admiralty jurisdiction "places boundaries on federal power to expand and contract admiralty jurisdiction, not on its power to arrange and rearrange substantive maritime remedies." *Lucas v. "Brinknes" Schiffahrts Ges.*, 387 F.Supp. 440, 443 (E.D.Pa.1974) (three-judge court). *See also Hurst*, 554 F.2d at 1244–45. As the Supreme Court has stated:

> The framers of the Constitution did not contemplate that the maritime law should remain unalterable. The purpose was to place the entire subject, including its substantive as well as its procedural features, under national control. From the beginning the grant was regarded as implicitly investing legislative power for that purpose in the United States. When the Constitution was adopted, the existing maritime law became the law of the United States "subject to power in Congress to alter, qualify or supplement it as experience or changing conditions might require." The Congress thus has paramount power to determine the maritime law which shall prevail throughout the country. But in amending and revising the maritime law, the Congress necessarily acts within a sphere restricted by the concept of the admiralty and maritime jurisdiction.

*The Thomas Barlum*, 293 U.S. at 43–44, 55 S.Ct. at 38. Thus the Constitution specifies the body which shall be responsible for applying maritime law—the federal judiciary—but does not prohibit alteration of the substantive maritime law which shall be applied. The ASA does not run afoul of this principle. It determines what the substantive law is, but it does not restrict the jurisdiction of federal courts to resolve questions concerning application of that law.[14]

---

**14.** No congressional enactment has yet been struck down on the basis that it impermissibly interfered with the admiralty jurisdiction of the

federal courts. *Hurst*, 554 F.2d at 1244. "[I]n light of the Supreme Court's repeated approval of major congressional changes in admiralty

■ **2) Uniformity.** Plaintiff's second argument that the ASA is unconstitutional is that the ASA destroys the uniformity which is constitutionally mandated for congressional enactments in the realm of maritime law. As plaintiff points out, the need for uniformity provided the rationale for the constitutional grant of admiralty jurisdiction to the federal courts. *See Knickerbocker Ice Co. v. Stewart*, 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834 (1920). Enactments which are inconsistent with such uniformity thus run afoul of the Constitution.

In order to address plaintiff's uniformity arguments, it is necessary to review some of the highlights in the history of the uniformity doctrine. In *The Lottawanna,* 88 U.S. (21 Wall.) 558, 22 L.Ed. 654 (1874), the Supreme Court held that a state legislature could confer maritime liens, enforceable in admiralty jurisdiction, for supplies and repairs furnished to a ship in her home port, even though the general maritime law did not provide for such liens. In doing so, the Court stated:

> [T]he Constitution must have referred to a system of law coextensive with, and operating uniformly in, the whole country. It certainly could not have been the intention to place the rules and limits of maritime law under the disposal and regulation of the several States, as that would have defeated the uniformity and consistency at which the Constitution aimed on all subjects of a commercial character affecting the intercourse of the States with each other or with foreign states.

88 U.S. at 575. This language provided the linchpin for the Supreme Court, in *Southern Pacific Co. v. Jensen,* 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917), to find unconstitutional a New York workmen's compensation statute as applied to a longshoreman who was fatally injured on a gangway between a ship and the pier. The Court reasoned that because of the uniformity mandated by the Constitution, any

modification to the general maritime law must come from Congress rather than individual states. Because Congress had not acted in the sphere of workmen's compensation, it must have intended that no change be made. The state's application of its workmen's compensation act to the longshoreman came within the scope of maritime law, and it thus conflicted with the nationally uniform system contemplated by congressional inaction. 244 U.S. at 213–18, 37 S.Ct. at 528–30. The Court further stated:

> If New York can subject foreign ships coming into her ports to such obligations as those imposed by her Compensation Statute, other states may do likewise. The necessary consequence would be destruction of the very uniformity in respect to maritime matters which the Constitution was designed to establish; and freedom of navigation between the states and with foreign countries would be seriously hampered and impeded.

244 U.S. at 217, 37 S.Ct. at 529.

Congress attempted to alter this result in 1917 by amending the Judiciary Act to add the emphasized language:

> The jurisdiction vested in the courts of the United States in the cases and proceedings hereinafter mentioned, shall be exclusive of the courts of the several states: ... all civil causes of admiralty and maritime jurisdiction; saving to suitors, in all cases, the right of a common-law remedy where the common law is competent to give it, *and to claimants the rights and remedies under the workmen's compensation law of any state.* ...

40 Stat. 395 (1917) (emphasis added). In *Knickerbocker,* the Court held that this statute was unconstitutional because it contravened the uniformity principle. Pursuant to that principle:

> The Constitution ... took from the states all power, by legislation or judicial

jurisdiction, *see, e.g., Victory Carriers, Inc. v. Law,* 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971); *Gutierrez v. Waterman S.S. Co.,* 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963); *O'Donnell v. Great Lakes Dredge & Dock Co.,* 318

U.S. 36, 63 S.Ct. 488, 87 L.Ed. 596 (1943), even this ban on congressional interference with jurisdiction can relate only to extreme tampering with the territorial or subject matter jurisdiction of admiralty and maritime courts." *Id.* at 1245.

decision, to contravene the essential purposes of, or to work material injury to, characteristic features of [admiralty and maritime] law or to interfere with its proper harmony and uniformity in its international and interstate relations.

253 U.S. at 160, 40 S.Ct. at 440. The Court then reasoned that the Constitution forbade amendment of the general maritime law except by Congress, and that Congress—in the interest of uniformity—was prohibited from delegating this function to the states. 253 U.S. at 164, 40 S.Ct. at 441.

Undeterred, Congress tried again. Reading *Knickerbocker* narrowly as quarreling solely with the language Congress chose, it amended the Judiciary Act to remove from exclusive federal jurisdiction suits by "claimants for compensation for injuries to or death of persons other than the master or members of the crew of a vessel, their rights and remedies under the workmen's compensation law of any State, District, Territory, or possession of the United States." 42 Stat. 634 (1922). This formulation was struck down by the Court in *State of Washington v. W.C. Dawson & Co.*, 264 U.S. 219, 44 S.Ct. 302, 68 L.Ed. 646 (1924). The Court held that the differing language did not make the statute materially different from the previous one, and that the case was governed by *Jensen* and *Knickerbocker.* In concluding, the Court stated:

> This cause presents a situation where there was no attempt to prescribe general rules. On the contrary, the manifest purpose was to permit any state to alter the maritime law and thereby introduce conflicting requirements. To prevent this result the Constitution adopted the law of the sea as the measure of maritime rights and obligations. The confusion and difficulty, if vessels were compelled to comply with the local statutes at every port, are not difficult to see. Of course, some within the states may prefer local rules; but the Union was formed with the very definite design of freeing maritime commerce from intolerable restrictions incident to such control. The subject is national. Local in-

terests must yield to the common welfare. The Constitution is supreme.

264 U.S. at 228, 44 S.Ct. at 305.

The same year, in *Panama Ry. Co. v. Johnson,* 264 U.S. 375, 44 S.Ct. 391, 68 L.Ed. 748 (1924), the Court upheld the Jones Act, 46 U.S.C. § 688, which made clear the existence of common law remedies for seamen injured in the course of their employment by the negligence of the master or crew members. The Court recognized that the Constitution places certain limitations on congressional action in the field of maritime law, but held that the Jones Act did not exceed those limitations. Among the limitations recognized was that the congressional enactments "shall be coextensive with and operate uniformly in the whole of the United States." 264 U.S. at 387, 44 S.Ct. at 394. Thus, "as Congress is empowered by the constitutional provision to alter, qualify or supplement the maritime rules, there is no reason why it may not bring them into relative conformity to the common-law rules or some modification of the latter, if the change be country-wide and uniform in operation." *Id.* at 388, 44 S.Ct. at 394.

More recently, the Court revisited the uniformity doctrine in *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986). In *Offshore,* the Court read the Death on the High Seas Act, 46 U.S.C. §§ 761 *et seq.,* as preempting common law wrongful death remedies, notwithstanding the Act's [provision] that "[t]he provisions of any State statute giving or regulating rights of action or remedies for death shall not be affected." 46 U.S.C. § 767. In light of the uniformity principles contained in *Knickerbocker* and *Jensen,* the Court interpreted this provision as merely a jurisdictional saving clause, ensuring that actions could continue to be brought in state court, rather than as a requirement that state substantive law apply on the high seas. 477 U.S. at 220–229, 106 S.Ct. at 2493–98.

Plaintiff first contends that the ASA destroys uniformity because it applies only to certain shipwrecks, and the terms it uses to define those shipwrecks—such as "embed-

ded"—are unreasonably vague. The ASA defines "embedded" as "firmly affixed in the submerged lands or in coralline formations such that the use of tools of excavation is required in order to move the bottom sediments to gain access to the shipwreck, its cargo, and any part thereof." 43 U.S.C. § 2102(a). Plaintiff argues that terms such as "firmly affixed" and "tools of excavation" are so vague that they will lead to endless disputes.

This argument may be disposed of rather simply. It requires too broad a reading of the uniformity doctrine. A review of the cases described above reveals that by "uniformity," courts refer to the need for a consistent national law on maritime matters. The Constitution, under this principle, does not allow Congress or the states to create a scheme in which matters of maritime law vary from jurisdiction to jurisdiction within the United States. That the ASA may change the substantive law governing certain shipwrecks does not destroy this uniformity. Different shipwrecks may be treated differently, but only due to their characteristics, not due to varying laws among jurisdictions. Furthermore, the Court is not at all convinced that, with respect to the aspects of the ASA material to this case, it has changed in any significant way the law governing shipwrecks. As described above (*supra* at 1342–43), the Submerged Lands Act and the common law of finds already operate to give states title to abandoned shipwrecks embedded in seabeds under their territorial waters. The ASA merely confirms this result.

The ASA's use of words that require judicial interpretation does not alter this conclusion. All statutes include words which courts must interpret, and the ASA is not unique in this respect. Indeed, there is already a body of case law interpreting such terms as "embedded." (*See supra* at 1343.) The ASA's use of such words may, at the most, lead to some inconsistency between interpretations of the statute by lower courts. Such inconsistency, however, is not the kind of variance of law between jurisdictions prohibited by the uniformity doctrine.

■ Plaintiff contends that the ASA also destroys uniformity by transferring title to the states, thus giving states the power to enact widely divergent laws governing the shipwrecks. Furthermore, plaintiff contends that the law will differ in those areas which remain subject to federal jurisdiction, such as territorial waters of the United States or Native American tribes, where the laws of salvage and finds will continue to apply.

This argument raises a more colorable challenge to the ASA's constitutionality. Plaintiff's contention that the ASA gives control of shipwrecks to the states, which are free to enact inconsistent laws governing those shipwrecks, appears on its face to implicate the kind of concerns underlying the uniformity doctrine. However, those concerns evaporate upon closer examination. The function of maritime law with respect to shipwrecks, specifically the law of finds and the law of salvage, is to determine ownership over a wreck and possible salvage awards. It does not govern what the owner of the wreck does with the artifacts or proceeds once ownership in those artifacts or proceeds is determined. For instance, were plaintiff to prevail in this action, be awarded title to the *Lady Elgin* and the *Seabird,* and commence selling for profit the artifacts he removed from the wrecks, maritime law would not govern his sales transactions. If various states, through their commercial codes, regulated such sales transactions differently, the lack of uniformity would not pose a constitutional challenge to those codes based on the federal admiralty jurisdiction. Similarly, the maritime law—of which the ASA is now part—governs questions of title to the shipwrecks which are subject to its coverage. Once the maritime law has operated to vest title to those shipwrecks in the states, the possible inconsistencies in the treatment of the wrecks by the states does not create constitutional problems.

The importance of this distinction may be further illustrated by reference to one of the ongoing concerns identified in the Supreme Court's discussions of uniformity.

The Supreme Court, when it has elaborated on the need for a nationally uniform maritime law, has expressed concern for the burdens on commerce of inconsistent laws among jurisdictions. For example, a ship that docked at ports in many different states might be subject to widely varying laws concerning compensation of injured workers. *See, e.g., Washington, supra,* 264 U.S. at 228, 44 S.Ct. at 305. This concern for commerce and the need for a uniform standard to guide a party's conduct is not implicated by the ASA. The shipwrecks are stationary, each subject to the jurisdiction in which it is located. The ASA sets forth very specific standards for determining when title to those shipwrecks is vested in the states. Those standards do not change from jurisdiction to jurisdiction.

Thus the types of nonuniformities identified by plaintiff are not such as to render the ASA unconstitutional.[15] Accordingly, the ASA gives the State an alternative colorable claim to ownership of the *Lady Elgin* and the *Seabird.*

▪ Implicit in plaintiff's brief is the further argument that the result of the analysis set forth in the text is to deprive plaintiff of any forum at all to litigate the ownership of the wrecks. Whether the State actually has ownership of the wrecks (as opposed to whether its claim is colorable) is a question which may be ripe for judicial decision but which the Eleventh Amendment, as interpreted here, forbids this Court to decide. Yet the federal jurisdiction over maritime matters is exclusive, *see* 28 U.S.C. § 1333, so the ownership question cannot be litigated anywhere else.

▪ Although this argument is superficially attractive, it rests on an overly strict view of the exclusive federal jurisdiction created by § 1333. This "exclusiveness" has always been "somewhat illusory." *Ju-*

*piter Wreck,* 691 F.Supp. at 1391, quoting 7A Moore's Federal Practice ¶ .210 at 2201 (2d ed. 1988). State court jurisdiction has always been concurrent over certain maritime matters. *Jupiter Wreck,* 691 F.Supp. at 1391. Furthermore, to the extent the Eleventh Amendment conflicts with § 1333, the Eleventh Amendment controls; and to the extent the ASA may be read as conflicting with § 1333, the ASA is a more specific statute which takes precedence over the general provisions of § 1333. The Court thus finds that § 1333 does not require assertion of federal jurisdiction over this case in the face of the contrary result mandated by the Eleventh Amendment and the ASA.

Because the State has a colorable claim to ownership of the shipwrecks, the action is a suit against the State. Pursuant to *Treasure Salvors,* it must therefore be dismissed as barred by the Eleventh Amendment unless the State has consented to jurisdiction.

### III. CONSENT

▪ In *Treasure Salvors,* the Supreme Court stated that federal judicial determination of ownership (as opposed to resolution of the arrest warrant) was barred by the Eleventh Amendment unless "the State voluntarily advanced a claim to the artifacts." 458 U.S. at 700, 102 S.Ct. at 3322. Plaintiff argues that the State has voluntarily advanced such a claim in this case and has thus waived its sovereign immunity.

Plaintiff relies primarily on *Cobb Coin II, supra,* and *Illinois Department of Transportation v. American Commercial Lines ("IDOT"),* 350 F.Supp. 835 (N.D.Ill. 1972). Neither of those decisions, however, applies to the facts of this case. In *Cobb Coin II,* the state answered the *in rem*

---

**15.** In its amicus brief, the American Sport Divers Association raises several other arguments under the rubric of the ASA's alleged lack of uniformity. It argues that Congress intended to regulate only shipwrecks of historic value, but that its language goes far beyond such shipwrecks. It also argues that allowing states to claim title to wrecks which have not yet been identified or discovered deprives divers and sal-

vors of the fruits of their labor. Because of a lack of public funds for salvaging and preservation operations, the Association argues that most wrecks will remain undiscovered without incentives for private salvors and divers. Although these arguments raise interesting issues with respect to the wisdom of the ASA, they do not implicate the uniformity required by the Constitution with respect to admiralty law.

complaint and filed a counterclaim in which it asserted ownership and requested a declaratory judgment that it was the sole owner of the vessel. 549 F.Supp. at 554. As described by the court, the state "voluntarily appeared in this lawsuit, asked the Court to adjudicate its rights, and conducted extensive litigation on over 30 different issues it claims defeat the interests asserted by the plaintiff including that Florida owns the wrecked vessel and the artifacts." *Id.* The court held that these actions constituted a consent to a determination of the state's rights by the federal court. In this case, in contrast, the State has not filed a counterclaim or undertaken any voluntary actions other than to assert its sovereign immunity.

In *IDOT*, the state agency was the plaintiff in an admiralty action seeking recovery for damage to a bridge allegedly caused by the defendants' negligent operation of a tow boat pushing eight barges. One of the defendants filed a counterclaim alleging that the state agency was negligent in its operation of the bridge. The court held that the state agency, by bringing the lawsuit and invoking the federal court's jurisdiction, had voluntarily submitted to the court's jurisdiction and was thus not protected from the counterclaim by reason of sovereign immunity. 350 F.Supp. at 837. The difference between *IDOT* and the case at hand is obvious; here, the State did not bring the underlying lawsuit but rather appeared only to protect its interests after plaintiff sought title against "all the world."

In support of its argument that it has not consented to jurisdiction, the State relies on the cases of *Marx v. Government of Guam*, 866 F.2d 294 (9th Cir.1989), and *Fitzgerald v. Unidentified Wrecked and Abandoned Vessel*, 866 F.2d 16 (1st Cir. 1989). In each of those cases, the court held that a state which intervened in an *in rem* action for the limited purpose of moving to dismiss the action on the basis of sovereign immunity did not waive its sovereign immunity. *Marx*, 866 F.2d at 301; *Fitzgerald*, 866 F.2d at 17. *See also Riebe v. Unidentified, Wrecked and Abandoned 18th Century Shipwreck*, 691 F.Supp. 923,

926 (E.D.N.C.1987); *Subaqueous Exploration v. Unidentified, Wrecked and Abandoned Vessel*, 577 F.Supp. 597, 614 (D.Md. 1983).

Plaintiff argues that these cases should not be followed because they are inconsistent with the *Treasure Salvors* opinion. He argues that both *Marx* and *Fitzgerald* perpetuated an erroneous statement in *Maritime Underwater Surveys, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel*, 717 F.2d 6 (1st Cir.1983). The statement at issue is: "Because this is not a claim against a named state official, and because of *the Eleventh Amendment's flat prohibition of suits against states regardless of their merit*, we need not reach the colorability of the Commonwealth's claim...." 717 F.2d at 8 (emphasis added). This Court does have concerns with the breadth of *Maritime*'s language. (*See supra* at n. 7.) However, regardless of the merit of this statement, it does not relate to the issue of consent and it certainly does not cast doubt on holdings in later cases addressing the consent issue. The precedents are unambiguous in holding that when a State's involvement in an *in rem* action is limited to intervention for the sole purpose of disputing federal jurisdiction pursuant to the Eleventh Amendment, that involvement does not constitute a waiver of sovereign immunity. This Court finds this principle sensible; the State must have a way to protect its interests without waiving those very interests. The Court is thus unwilling to depart from the prior cases. Accordingly, the Court rejects plaintiff's argument that the State has consented to the adjudication of its ownership interests by this Court.

## IV.  CONCLUSION

Because these actions are against the State without its consent in violation of the Eleventh Amendment, they must be dismissed with respect to the State. The question then arises whether either or both actions should be dismissed entirely. Where the State is the only claimant other than the plaintiff, courts faced with this situation have resolved this question in dif-

fering ways. Some courts have dismissed the entire action on the theory that further proceedings in federal court are pointless where the state is the primary claimant other than the plaintiff. *See, e.g., Fitzgerald, supra,* 866 F.2d at 18–19; *Marx, supra,* 866 F.2d at 301; *Maritime, supra,* 717 F.2d at 8. Other courts have permitted the case to continue against "all the world" other than the state which prevailed on its motion to dismiss. *See, e.g., State of Florida v. Treasure Salvors, Inc.,* 689 F.2d 1254, 1256 (5th Cir.1982); *Riebe, supra,* 691 F.Supp. at 927; *Jupiter Wreck, supra,* 691 F.Supp. at 1384. *Cf. Treasure Salvors,* 458 U.S. at 684, 102 S.Ct. at 3314 ("the fact that the State should have been dismissed from an action that has proceeded to judgment may not stand against other parties who are not immune from suit"). Where further proceedings in federal court would be superfluous because the primary dispute involves the State and the State is thus an indispensable party, *see* Fed.R. Civ.P. 9(b), the Court agrees that the entire action should be dismissed. Accordingly, the *in rem* action concerning the *Seabird* shall be dismissed in its entirety.

The situation with respect to the *Lady Elgin* is different because the State is not the only claimant. The Foundation has also intervened to assert a claim of ownership. Because the Foundation is controlled by plaintiff, the Court has concerns as to whether the conflicting ownership claims of plaintiff and the Foundation constitute a "case or controversy" sufficient to maintain the action in federal court. The Court also does not know whether, in light of this Opinion, the Foundation desires to pursue its claim in this case. Because plaintiff and the Foundation have not yet had an opportunity to fully address these issues, at this time the Court will dismiss the *Lady Elgin* action solely insofar as it seeks relief against the State.[16]

The Court is not without some sympathy for plaintiff's position. It was plaintiff who expended considerable time and resources in pursuing the wrecks. Without plaintiff's efforts, the wrecks might remain undiscovered. The State, in contrast, appears to have sat idly by, showing no interest in the wrecks until plaintiff brought this lawsuit. Plaintiff's contention that he should receive ownership, or at least a salvage award, for his efforts, is attractive.

It is not this Court's function, however, to second-guess policy determinations which have been made by the legislative branch. It could reasonably be concluded that state ownership of abandoned shipwrecks is necessary to protect the wrecks against those divers and salvors who may be unscrupulous.[17] Ensuing legislation making clear the states' rights to the shipwrecks does not foreclose divers and salvors from continuing their operations and receiving the fruits of their labors; it merely provides a legal backdrop for those efforts. There is nothing to prevent divers

**16.** Plaintiff and the Foundation are directed to file written reports with the Court showing why this case should not be dismissed in its entirety. In addition to any other information and argument plaintiff and the Foundation may wish to present, they should address: (1) why the case is not rendered moot by the presence of Harry Zych both as plaintiff and as Executive Director of the sole remaining prospective claimant; (2) why Paul Keller should be allowed to act as attorney both for plaintiff and for the Foundation when plaintiff and the Foundation have asserted inconsistent ownership interests; and (3) why there is any purpose to continuing this action in light of the dismissal of the State from the case. In lieu of such reports, plaintiff and the Foundation may inform the Court that they agree, in light of the Opinion, that the case may be dismissed in its entirety (without, of course, waiving plaintiff's right to appeal from the dismissal of the State).

**17.** In introducing the Senate bill on which the ASA was based, Senator Bill Bradley stated:

The United States is the only country in the world with a substantial number of historic shipwrecks that does not have a [national] law recognizing the importance of preserving some of these sites. There is no Federal law requiring orderly and archeologically correct excavation when salvage does take place. Instead, a finders-keepers principle applies to all shipwrecks in our waters. While this rule makes sense in matters of ongoing maritime commerce, it is as obviously inappropriate for underwater archeological sites as it would be for ancient ruins on land.

Cong.Rec. S. 3988–89 (Mar. 26, 1987), *quoted in* Owen, *The Abandoned Shipwreck Act of 1987: Good–Bye to Salvage in the Territorial Sea,* 19 J.Mar.L. & Comm. 499, 502 (1988).

and salvors from reaching agreements with the appropriate states in advance whereby those who discover abandoned shipwrecks will be entitled to retain a certain portion of their discoveries.[18] Such agreements would benefit the divers and salvors, by compensating them for their efforts, as well as the states, by bringing into their possession shipwrecks which might otherwise go undiscovered. Such a scheme would also benefit the public by allowing the state to control, through licensing requirements, the conduct of divers and salvors.

For the reasons described in this opinion, the action must be dismissed for want of jurisdiction.

---

**18.** The State of Illinois now expressly provides for permits to be granted for the exploration or excavation of abandoned shipwrecks. *See* Ill. Rev.Stat. ch. 127 ¶¶ 133c.01 *et seq. See also supra* at n. 9.